No. 15-1183

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

IN RE: QUINCY MEDICAL CENTER, INC., QMC ED PHYSICIANS, INC.,
QUINCY PHYSICIANS CORPORATION,
Debtors,

_____

QUINCY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC.,
Appellee,

v.

APURV GUPTA, M.D.; VICTOR MUNGER,
Appellants.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(4:12-cv-40128-RWZ; 4:12-cv-40131-RWZ)

_____

## JOINT BRIEF OF THE APPELLANTS
## APURV GUPTA, M.D. AND VICTOR MUNGER

_____

Bruce W. Gladstone, Esq.
Leah L. Miraldi, Esq.
Cameron & Mittleman LLP
301 Promenade Street
Providence, RI 02908
(401) 331-5700
bgladstone@cm-law.com
lmiraldi@cm-law.com

*Counsel for Apurv Gupta, M.D.*

Charles R. Bennett, Jr., Esq.
Murphy & King, P.C.
One Beacon Street
Boston, MA 02108
(617) 423-0400
cbennett@murphyking.com

*Counsel for Victor Munger*

# **TABLE OF CONTENTS**

STATEMENT WITH RESPECT TO ORAL ARGUMENT ................................. 1

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ........................................................... 3

    I.      Nature of the Case ............................................................. 3

    II.    Statement of Facts ............................................................. 4

    III.   Course of Proceedings ........................................................ 9

SUMMARY OF THE ARGUMENT ................................................... 13

ARGUMENT ......................................................................... 15

    I.      Standard of Review ......................................................... 15

    II.    The Bankruptcy Court Had Subject Matter Jurisdiction to Hear the
         Motions and Enter the Final Orders ................................... 17

        a. *The District Court Erred as a Matter of Law When it Engaged in a
           "Related To" Analysis* ............................................... 17

        b. *The Bankruptcy Court Had Subject Matter Jurisdiction Because
           Dr. Gupta's and Mr. Munger's Claims "Arose In" Title 11* ....... 23

    III.   The Bankruptcy Court Had Statutory Authority to Hear the Motions
         and Enter the Final Orders ............................................. 27

    IV.   The Bankruptcy Court Did Not Violate Article III When it Heard the
         Motions and Entered the Final Orders, As Steward Knowingly and
         Voluntarily Consented to Such Adjudication ....................... 32

CONCLUSION ....................................................................... 39

i

# TABLE OF AUTHORITIES

*Cases*:

*Alphas Co. v. Empacadora, GAB, Inc.,*
    519 F. App'x 692 (1st Cir. 2013) ................................................. 38

*Executive Benefits Ins. Agency v. Arkison,*
    134 S. Ct. 2165,189 L. Ed. 2d 83 (2014) ............................................. 32, 33

*First Marblehead Corp. v. Education Resources Institute, Inc.,*
    463 B.R. 151 (D.Mass. 2011) ......................................................... 19, 21, 26

*Gately v. Com. of Mass.,*
    2 F.3d 1221 (1st Cir. 1993) ......................................................... 25

*Grella v. Salem Five Cent Sav. Bank,*
    42 F.3d 26 (1st Cir. 1994) ......................................................... 16

*In re Ames Dep't Stores, Inc.,*
    317 B.R. 260 (Bankr. S.D.N.Y. 2004) ................................................. 23, 27

*In re Boston Reg'l Med. Ctr., Inc.,*
    410 F.3d 100 (1st Cir. 2005) ......................................................... 17

*In re G.S.F. Corp.,*
    938 F.2d 1467  (1st Cir. 1991) ..................................................... 18

*In re Carp,*
    340 F.3d 15 (1st Cir. 1991) ......................................................... 16

*In re Healthco Int'l, Inc.,*
    132 F.3d 104 (1st Cir. 1997) ......................................................... 15, 16

*In re Hill,*
    562 F.3d 29 (1st Cir. 2009) ......................................................... 17

*In re Kiker,*
    98 B.R. 103 (Bankr.N.D.Ga. 1988) ................................................... 29

*In re Lacey,*
    2011 WL 5117767 (Bankr.D.Mass. 2011) .................................................. 33

*In re Middlesex Power Equip. & Marine, Inc.,*
    292 F.3d 61 (1st Cir. 2002) ........................................................... 17, 24, 25

*In re Millenium Seacarriers, Inc.,*
    458 F.3d 92 (2d Cir. 2006) ........................................................................ 25

*In re Motors Liquidation Co.,*
    514 B.R. 377 (Bankr.S.D.N.Y. 2014) ....................................................... 20

*In re Ortiz,*
    665 F.3d 906 (7th Cir. 2011) .................................................................... 33

*In re Petrie Retail, Inc.,*
    304 F.3d 223 (2d Cir. 2002) ..................................................................... 26

*In re Quincy Med. Ctr., Inc.,*
    2014 WL 7399088 (Bankr.D.Mass. Dec. 29, 2014) ................................. 30

*In re Quincy Med. Ctr., Inc. (QMC I),*
    466 B.R. 26 (Bankr.D.Mass. 2012) ......................................... 10, 19, 24, 26

*In re Quincy Med. Ctr., Inc. (QMC II),*
    479 B.R. 229 (Bankr.D.Mass. 2012) .............................................. 12, 21, 26

*In re Sheridan,*
    362 F.3d 96 (1st Cir. 2004) ...................................................................... 28

*In re Texaco Inc.,*
    182 B.R. 937 (Bankr. S.D.N.Y. 1995) .......................................... 23, 27, 29

*In re The Education Resources Institute, Inc.,*
    442 B.R. 20 (Bankr.D.Mass. 2010) ............................................... 19, 21, 22

*In re Toledo,*
    170 F.3d 1340 (11th Cir. 1999) ................................................................ 18

*In re Vazquez Laboy,*
    647 F.3d 367 (1st Cir. 2011) ....................................................................... 17

*In re Whispering Pines Estates, Inc.,*
    369 B.R. 752 (B.A.P. 1st Cir. 2007) .......................................................... 16

*Lothian Cassidy, LLC v. Lothian Exploration & Dev. II, L.P.,*
    487 B.R. 158 (S.D.N.Y. 2013) ........................................................ 18, 23, 24

*Martin v. Bajgar (In re Bajgar),*
    104 F.3d 495 (1st Cir. 1997) ....................................................................... 16

*Palmacci v. Umpierrez,*
    121 F.3d 781 (1st Cir. 1997) ....................................................................... 16

*Quincy Med. Ctr. v. Gupta, et al.,*
    2015 WL 58633 (D.Mass. Jan. 5, 2015) ............................................... 19, 22

*Roell v. Withrow,*
    538 U.S. 580, 123 S.Ct. 1696, 155 L.Ed.2d 775 (2003) ....................... 35, 39

*Shiboleth v. Yerushalmi,*
    412 B.R. 113 (S.D.N.Y. 2009) .................................................................... 18

*Smith v. Commercial Banking Corp. (In re Smith),*
    866 F.2d 576 (3d Cir. 1989) ....................................................................... 18

*Stern v. Marshall,*
    131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011) ......................................... *passim*

*Travelers Indem. Co. v. Bailey,*
    557 U.S. 137, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009) ............. 19, 21, 26, 31

*Wellness Int'l Network, Ltd. v. Sharif,*
    135 S. Ct. 1932 (2015) ...................................................................... *passim*

*White v. Kubotek Corp., et al.,*
    487 B.R. 1 (D. Mass. 2012), *aff'd*, No. 13-1290 (1st Cir. Sept. 24, 2013)
    ……………………………………………………………………... *passim*

iv

*Wood v. Wood (In re Wood),*
   825 F.2d 90 (5th Cir. 1987) ................................................................. 18, 24


<u>*Other Authorities*</u>:

United States Constitution, Article III, § 1 ...................................... *passim*

11 U.S.C. § 105 ............................................................................... 28, 31

11 U.S.C. § 363 ............................................................................ 5, 24, 28

11 U.S.C. § 365 ............................................................................ 5, 24, 28

11 U.S.C. § 503 .................................................................................. *passim*

28 U.S.C. § 157 .................................................................................. *passim*

28 U.S.C. § 158 .............................................................................. 1, 16, 17

28 U.S.C. § 1291 .................................................................................... 1

28 U.S.C. § 1334 ............................................................................... *passim*

Federal Rule of Bankruptcy Procedure 9001 ....................................... 30

District of Massachusetts Local Rule 201 ............................................ 17

District of Massachusetts Local Rule 206 ............................................ 30

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The Appellants, Apurv Gupta, M.D. and Victor Munger, hereby request oral argument and submit that oral argument will assist the Court in understanding the jurisdictional issues presented in this appeal.

## STATEMENT OF JURISDICTION

On September 25, 2012, the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") issued a Memorandum of Decision and accompanying Orders holding the Appellee, Quincy Medical Center, a Steward Family Hospital, Inc. ("Steward"), liable to the Appellants, Apurv Gupta, M.D. ("Dr. Gupta") and Victor Munger ("Mr. Munger"), for certain amounts due to each of them by Steward. On October 1, 2012, pursuant to 28 U.S.C. § 158(a), Steward filed notices of appeal of the Bankruptcy Court's Orders to the United States District Court for the District of Massachusetts (the "District Court"). On January 5, 2015, without oral argument having been heard, the District Court issued a Memorandum of Decision, vacating the Bankruptcy Court's Orders and remanding the case with instructions to dismiss Dr. Gupta's and Mr. Munger's claims for lack of subject matter jurisdiction under 28 U.S.C. §§ 157 and 1334. On February 3, 2015, Dr. Gupta and Mr. Munger timely filed a Joint Notice of Appeal to this Court, which now has jurisdiction to hear the appeal pursuant to 28 U.S.C. § 158 and 28 U.S.C. § 1291.

1

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the District Court erred as a matter of law:  a) when it ignored the Bankruptcy Court's jurisdiction to interpret and enforce its own prior orders, despite the fact that the Bankruptcy Court explicitly retained jurisdiction in the Sale Order to, among other things, "interpret, implement and enforce" the Sale Order and the Asset Purchase Agreement and to "resolve any disputes arising under or relating to" the Sale Order and the Asset Purchase Agreement; b) when it failed to give deference to the Bankruptcy Court's interpretation of its own prior orders; and c) when it found that the Bankruptcy Court lacked subject matter jurisdiction under 28 U.S.C. § 1334 over the disputes.

2.      Whether the District Court further erred as a matter of law:  a) when it found that the Bankruptcy Court "did not determine whether the disputes on appeal were core proceedings", notwithstanding the Bankruptcy Court's express findings otherwise in the Sale Order and its later decisions; and b) when it "assume[d]" that the disputes on appeal were "non-core proceedings", despite the Bankruptcy Court's determinations regarding its jurisdiction to interpret and enforce its own prior orders, including jurisdiction "to hear and rule upon disputes arising from the sale by Q[uincy] M[edical] C[enter] to Steward", which, as a matter of law, are proceedings over which the Bankruptcy Court may exercise subject matter jurisdiction as the disputes "arose in" Title 11 and were thus "core" proceedings

under 28 U.S.C. § 1334.

3. Whether the Bankruptcy Court not only had subject matter jurisdiction over the disputes under 28 U.S.C. § 1334, but whether it also had the statutory authority under 28 U.S.C. § 157 to enter final orders and judgments thereon, as well as the constitutional authority to enter such final orders and judgments consistent with Article III, § 1 of the United States Constitution in light of Steward's knowing and voluntary consent.

## STATEMENT OF THE CASE

### I.    Nature of the Case

Dr. Gupta and Mr. Munger, former senior executives of the Chapter 11 debtor, Quincy Medical Center, Inc. ("QMC"), filed substantively similar motions seeking allowance of administrative expense claims under 11 U.S.C. § 503(b)(1) for severance pay due to them under QMC's Executive Severance Policy dated January 1, 2011. After an initial hearing, the Bankruptcy Court denied Dr. Gupta's and Mr. Munger's motions as to QMC, but determined that the motions also sought relief in the alternative against Steward, which purchased substantially all of QMC's assets. After giving Steward time to respond to Dr. Gupta's and Mr. Munger's motions, the Bankruptcy Court conducted a second non-evidentiary hearing, at the conclusion of which the Bankruptcy Court solicited additional memoranda and affidavits from the parties, including Steward. Upon receipt and

review of the additional materials, the Bankruptcy Court took the matter under advisement and ultimately granted Dr. Gupta's and Mr. Munger's motions as to Steward and entered final orders thereon.   Steward appealed the Bankruptcy Court's orders to the District Court, which reversed and vacated the orders for lack of subject matter jurisdiction.   Dr. Gupta and Mr. Munger now seek this Court's review and request that the District Court's Decision be reversed and that the Bankruptcy Court's orders be reinstated.

II.   <u>Statement of Facts</u>[1]

The relevant facts are not in dispute.   Dr. Gupta served as Senior Vice President for Clinical Affairs/Chief Medical Officer of QMC pursuant to an Employment Agreement, effective October 1, 2009.   *App.* at 695-707.   Mr. Munger served as QMC's Senior Vice President of Human Resources pursuant to a Letter Agreement, effective March 1, 2010.   *App.* at 641.   Both executives were included in QMC's Executive Severance Policy, as set forth in a memorandum dated January 1, 2011.   *App.* at 643-644; 712-713.   The Executive Severance Policy entitled them to, among other things, a minimum of six (6) and a maximum of twelve (12) months' base salary continuation upon termination of employment

---

[1]   This Statement of Facts adopts the Facts from the Bankruptcy Court's Memorandum of Decision on Motions of Apurv Gupta and Victor Munger for Allowance of Administrative Expense Claims, dated September 25, 2015, *Add.* at 34-47, as well as portions of the Bankruptcy Court's Memorandum of Decision on Motions of Apurv Gupta and Victor Munger for Allowance of Administrative Expense Claims, dated February 13, 2012. *Add.* at 21-29.

other than for cause.  *Id.*

On June 30, 2011, QMC and its affiliates signed an Asset Purchase Agreement whereby they agreed to sell substantially all of their assets to Steward. *App.* at 228-315 (the "APA").   The APA provides that it is governed by Massachusetts law.  *Id.* at 306.   On July 1, 2011, QMC and certain affiliates commenced the underlying bankruptcy case by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.  *See App.* at 194.   A motion to sell the debtors' assets to Steward pursuant to 11 U.S.C. §§ 363 and 365 was filed the same day, *App.* at 196-226 (the "Sale Motion"), and the Sale Motion was subsequently allowed by order dated September 26, 2011.  *App.* at 584-635 (the "Sale Order").  The Sale Order specifically approved the APA and made the APA, as well as the Sale Order itself, binding on Steward and QMC, including QMC's employees, officers and directors.[2]  *Id.* at 610.   The sale was consummated on

---

[2]  Paragraph 30 of the Sale Order provides:

> The terms and provisions of the APA, together with the terms and conditions of this Order, shall be binding in all respects upon all entities, including, without limitation, the Company (including its employees, officers and directors), its estates, all creditors and equity interest holders of the Company, Steward, and their respective affiliates, successors and assigns, agents and any affected third parties, including, but not limited to, all persons asserting a claim against or interest in any of the Assets to be sold, conveyed or assigned to Steward pursuant to the APA.

*App.* at 610.

October 1, 2011.

Among the assets not purchased by Steward and for which the APA states Steward assumed no liability are those assets defined in the APA as "Excluded Assets." *App.* at 237. The Excluded Assets include contracts identified on schedule 2.2(b) to the APA. *Id.* Schedule 2.2(b) was not attached to the copy of the APA filed with the Bankruptcy Court.[3] Steward, however, provided an unverified and undated copy of schedule 2.2(b) in connection with its objection to Mr. Munger's and Dr. Gupta's motions. *App.* at 850-859. That schedule includes

---

Under paragraph 37 of the Sale Order, the Bankruptcy Court retains jurisdiction to "interpret [and] implement ..." the APA and to "resolve any disputes arising under or related to the APA". *App.* at 612. The Sale Order was never appealed.

Paragraph 21 of the Bankruptcy Court's order dated November 22, 2011, confirming QMC and affiliates' joint plan of liquidation, also provides that "the Sale Order shall survive Confirmation of the Plan, entry of this Order and the occurrence of the Effective Date." *App.* at 1005-1025 (the "Confirmation Order").

[3] According to the Bankruptcy Court, it was unclear whether schedule 2.2(b) existed when the APA was signed, as section 1.3(a)(iv) provides:

> [w]ith respect to all other Schedules ..., including without limitation the classification of executory contracts as Purchased Contracts, Excluded Contracts or Transitional Contracts, such Schedules (including any amendments to the original Schedules) shall be subject to the mutual agreement of the parties as embodied in (i) such Schedules as exist and are appended to this Agreement as of the date hereof and (ii) such Schedules as are subsequently included and incorporated into this Agreement.

*App.* at 246-247.

a section entitled "Excluded Medical Staff Agreements." *Id*. at 857-859. Listed as item 18 in that section is the "Employment Agreement between Quincy Medical Center and Dr. Apurv Gupta to serve as Quincy's Senior Vice President for Medical Affairs/Chief Medical Officer, effective October 1, 2009." *Id.* Mr. Munger's employment contract, which the parties refer to as a "Letter Agreement", does not appear anywhere on schedule 2.2(b).

Importantly, section 9.1 of the APA provides:

> Not later than ten (10) Business Days prior to the Closing, Purchaser shall offer employment by Purchaser to each of the Employees who remain employed by Seller as of a recent date, as specified by Seller to Purchaser at least three Business Days in advance of Purchaser commencing delivery of such offers of employment, such employment to commence immediately following the Closing. Seller shall deliver to Purchaser with such listing of Employees as of such date a reconciliation of such list with the list of Employees delivered to Purchaser pursuant to Section 5.14 [that is, a document reconciling the list of Employees with those who gave notice of their intention not to become employed by Steward]. Purchaser shall likewise deliver as soon as practicable such an offer to any individual not included on the list but who is an Employee as of the Closing Date. Each such offer of employment shall be at the same salary or hourly wage rate and position in effect immediately prior to the Closing. Such individuals who accept such offer of employment are hereinafter referred to as the "Transferred Employees."

*App.* at 294. As required by section 9.1 of the APA, at least three (3) business days before Steward was to make offers of employment to the QMC employees, QMC was to provide Steward with a list of its employees reconciled to remove the names of any employee who chose not to become employed by Steward. *Id.* According to the Declaration of Robert E. Annas, a managing director of Navigant Capital

7

Advisors, LLC ("Navigant"), which had been employed by QMC to assist in the sale transaction, Navigant maintained an electronic data room containing "due diligence" information relevant to QMC and available for review by qualified potential purchasers, including Steward. *App.* at 860-880 (the "Annas Affidavit"). According to the Annas Affidavit, the names of both Dr. Gupta and Mr. Munger appeared consistently on QMC employee lists that were posted to the electronic data room on March 28, 2011, September 13, 2011 and September 15, 2011. *Id.*

Next, section 9.2(a) of the APA provides:

> Purchaser shall provide, or cause to be provided, for a period ending not earlier than the end of the third month following the Closing Date or such longer period of time required by applicable Law, to each of the Transferred Employees, base wage and salary levels provided to such Employees immediately prior to the Closing. Purchaser shall provide each Transferred Employee with employee benefits consistent with similarly-situated employees of Purchaser (provided that nothing in this Section 9.2 shall require Purchaser to pay severance to any Transferred Employee).

*App.* at 294-295. Under section 5.14(c) of the APA, Steward was responsible for the severance pay or other payments to any individual employed by QMC as of the closing date in the event that Steward terminated the employment of such employee at or following the closing date. *App.* at 270. That section provides:

> Except as set forth in Section 5.14(c) of the Seller Disclosure Schedule [that is, a document reconciling the list of Employees with any who gave notice of their intention not to become employed by Steward] no Employee has given as of the date hereof notice of intention to leave Seller's employ before or after the Closing, and upon Purchaser's termination of the employment or engagement of any employees or consultants of Seller at or following the Closing, Purchaser shall be liable to any such persons for

8

> severance or retention pay or any other payments otherwise due them as
> employees of or consultants for Seller (including accrued salary or vacation
> in accordance with normal policies).

*Id.* Both Dr. Gupta and Mr. Munger were QMC employees in good standing on October 1, 2011, the date of the closing. Neither was offered employment by Steward.[4]

Subsequently, QMC sent both Dr. Gupta and Mr. Munger letters, dated October 7, 2011, stating that each was terminated effective October 1, 2011. *See App.* at 709-710. Each letter gave the same reason for the termination, namely, that QMC, having sold its assets to Steward, was no longer operating a hospital and no longer had a need for the services each provided. *Id.* The letters also noted that under the APA Steward was to offer employment to all employees of QMC. *Id.*

## III.   Course of Proceedings

On November 2, 2011, Mr. Munger filed a claim pursuant to 11 U.S.C. § 503(b)(1) for allowance of administrative expenses against QMC in the amount of $135,000, consisting of a severance pay claim of $90,000, representing six (6) months' salary, and a claim of $45,000, representing the minimum three (3) months' salary he would have received had Steward kept him employed and then

---

[4]   The inclusion of Dr. Gupta's employment contract among the Excluded Assets does not alter the fact that on the closing date he was an employee of QMC.

fired him.  *App.* at 636-653 (the "Munger Motion").  On November 17, 2011, Dr. Gupta filed a similar claim pursuant to 11 U.S.C. § 503(b)(1) for allowance of administrative expenses against QMC, which claim was later amended, seeking $234,000, consisting of a severance claim of $156,000, equal to six (6) months' salary, and a claim of $78,000, representing three (3) months' salary.  *App.* at 685-718; 910-914 (collectively, the "Gupta Motion") (and together with the Munger Motion, the "Motions").[5]  QMC acknowledged Mr. Munger's and Dr. Gupta's rights to receive the payments requested in the Motions, but objected to the granting of administrative priority to the claims.  *App.* at 719-731.  A non-evidentiary hearing was held by the Bankruptcy Court regarding the Motions on December 14, 2011.  *App.* at 732-766.

On February 13, 2012, the Bankruptcy Court entered a Memorandum of Decision on Motions of Apurv Gupta and Victor Munger for Allowance of Administrative Expense Claims with respect to the Motions.  *Add.* at 21-29 ("QMC I").  While the Bankruptcy Court denied administrative expense status to Mr. Munger's and Dr. Gupta's claims, it treated the Motions as "seeking relief in the alternative … for an order directing Steward to pay the claims."  *Id.* at 28.  The Bankruptcy Court issued separate orders, which offered Steward an opportunity to

---

[5]  The amended claim is half of what Dr. Gupta initially requested.  His amended claim is brought under the APA, not under his employment contract which was excluded from the assets purchased by Steward.

respond.  *Add.* at 30-31; 32-33.  On February 28, 2012, Steward filed its Objection to Motions of Victor Munger and Apurv Gupta, M.D. for Payment.  *App.* at 818-841 (the "Steward Response").

On March 14, 2012, the Bankruptcy Court held a second non-evidentiary hearing on the Motions at which Mr. Munger, Dr. Gupta, QMC, and Steward were heard.  *App.* at 769-817.  At the hearing, the Bankruptcy Court proposed "treating [the Motions and the Steward Response] like cross-motions for summary judgment and letting [the parties] file whatever [they] wanted to file to convince [the Bankruptcy Court] that there doesn't have to be any evidence taken … ".  *App.* at 815.  Steward, however, objected to that proposition, as it "had nothing that ambitious in mind".  *Id.*  While the Bankruptcy Court ultimately limited the scope of the further affidavits to be submitted by the parties in connection with the Motions, it specifically advised Steward that to the extent it wanted to file affidavits beyond that scope, it should (and could) file a separate motion with the Bankruptcy Court.  *App.* at 816.  At the conclusion of the hearing, the Bankruptcy Court also offered the parties an opportunity to submit any supplemental legal arguments, *id.*, which was also reflected in the Bankruptcy Court's orders.  *App.* at 842-843.

Accordingly, on April 3, 2012, QMC filed the Declaration of Robert E. Annas Regarding Employee Lists and Related Matters Pertinent to Asset Purchase

Agreement and Claims of Victor Munger and Apurv Gupta, M.D., *App.* 860-880 (*i.e.* the Annas Affidavit), and the Declaration of A. Davis Whitesell Regarding Amendments to Steward Asset Purchase Agreement. *App.* at 881-899. On April 5, 2012, Mr. Munger filed a Supplemental Memorandum in Support of the Claim by Victor Munger, *App.* at 900-909, and, on April 6, 2012, Dr. Gupta filed a Supplemental Memorandum in Support of the Claim by Apurv Gupta. *App.* at 910-914. On April 13, 2012, QMC filed Debtor's Brief Regarding Specific Performance of Steward's Obligations Underlying Claims of Victor Munger and Apurv Gupta, M.D., *App.* at 925-931, and Steward filed Quincy Medical Center, a Steward Family Hospital, Inc.'s Supplemental Objection to Motions of Victor Munger and Apurv Gupta, M.D. for Payment. *App.* at 933-951.

On September 25, 2012, the Bankruptcy Court issued a Memorandum of Decision on Motions of Apurv Gupta and Victor Munger for Allowance of Administrative Expense Claims, holding Steward liable to Dr. Gupta and Mr. Munger for amounts due to them under the APA. *Add.* at 34 (QMC II). The Bankruptcy Court entered accompanying final orders, allowing the Munger Motion as against Steward in the amount of $135,000, *Add.* at 48 (the "Munger Order"), and allowing the Gupta Motion as against Steward in the amount of $234,000. *Add.* at 49 (the "Gupta Order") (and together with the Munger Order, the "Orders").

12

On October 1, 2012, Steward filed Notices of Appeal to the District Court with respect to each of the Orders. The parties timely submitted their briefs to the District Court, including requests for oral argument. On January 5, 2015, nearly two (2) years after briefing was completed, and without oral argument having been heard, the District Court issued a Memorandum of Decision vacating the Bankruptcy Court's Orders for purported lack of subject matter jurisdiction and remanding with instructions to dismiss Mr. Munger's and Dr. Gupta's claims against Steward. *Add.* at 50-62 (the "Decision"). On February 3, 2015, Dr. Gupta and Mr. Munger filed a Joint Notice of Appeal to this Court for review. *Add* at 63-64.

## SUMMARY OF THE ARGUMENT

The District Court reversed and vacated the Orders entered by the Bankruptcy Court in favor of Dr. Gupta and Mr. Munger against Steward for a purported lack of subject matter jurisdiction under 28 U.S.C. §1334. However, as discussed herein, the District Court erred in its holding in several respects, particularly in its assumption that the disputes were "non-core" proceedings merely "related to" the QMC Chapter 11 bankruptcy proceedings. Instead, the disputes between Dr. Gupta and Mr. Munger on the one hand and Steward on the other "arose in" in QMC's Chapter 11 bankruptcy case, and were thus "core" proceedings that the Bankruptcy Court correctly exercised jurisdiction over.

13

A proceeding "arises in" a bankruptcy case when it would have no practical existence but for the bankruptcy, and it is well established that efforts to enforce the orders of a bankruptcy court are all in this category.  Essentially, but for QMC's Chapter 11 bankruptcy proceedings, which resulted in the court-ordered sale of substantially all of QMC's assets to Steward, including the authorization and approval of the APA under which Dr. Gupta's and Mr. Munger's claims against Steward arise, Dr. Gupta's and Mr. Munger's claims would not otherwise exist.  Moreover, the Bankruptcy Court expressly retained jurisdiction over disputes arising from QMC's sale of assets to Steward in both the Sale Order and the APA, among elsewhere, both of which are binding upon Steward, and which prior orders the Bankruptcy Court has the jurisdiction to interpret and enforce.

In that the District Court found a lack of subject matter jurisdiction under 28 U.S.C. § 1334, it did not reach the issues of whether the Bankruptcy Court also had the statutory and/or constitutional authority to enter final orders and judgments on the disputes between Dr. Gupta and Mr. Munger.  However, the Bankruptcy Court did have such statutory authority to rule because interpreting and enforcing an order resulting from a prior "core" proceeding also constitutes a "core" proceeding. Additionally, Dr. Gupta's and Mr. Munger's Motions, as well as the Sale Motion and the Sale Order, are enumerated circumstances under 28 U.S.C. 157(b) that constitute "core" proceedings.

14

As for the Bankruptcy Court's constitutional authority, this question only becomes pertinent if it were to be determined that Dr. Gupta's and Mr. Munger's claims were "*Stern* claims". While Dr. Gupta and Mr. Munger assert that their claims are not "*Stern* claims", even if it were to be determined that they were, the Supreme Court's recent decision in *Wellness* remedies any potential issues because, similar to the procedure allowed for "non-core" proceedings, it was held that a bankruptcy court may enter final orders and judgments on "*Stern* claims" with the knowing and voluntary consent of the parties. Steward undoubtedly supplied such consent in this case, both expressly via its consent to the Bankruptcy Court's retention of jurisdiction in the various documents and impliedly via its litigation conduct. Therefore, this Court should reverse the Decision of the District Court.

## **ARGUMENT**

### I.   Standard of Review

"Bankruptcy cases differ from most other federal cases in that the court of appeals does not afford first-instance appellate review." *In re Healthco Int'l, Inc.*, 132 F.3d 104, 107 (1st Cir. 1997). "Rather, Congress has provided for intermediate review, conferring on district courts and federal bankruptcy appellate panels the authority to hear appeals from bankruptcy court decisions, but preserving to the parties a right of further review in the courts of appeals." *Id.*

(citing 28 U.S.C. § 158). "Whether such an appeal comes to [this Court] by way of the district court or the BAP, [this Court's] regimen is the same: [this Court] focus[es] on the bankruptcy court's decision, scrutinize[s] that court's findings of fact for clear error, and afford[s] de novo review to its conclusions of law." *Id.* (citing *Martin v. Bajgar (In re Bajgar)*, 104 F.3d 495, 497 (1st Cir. 1997); *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994)). "Since this is exactly the same regimen that the intermediate appellate tribunal must use, [this Court] exhibit[s] no particular deference to the conclusions of that tribunal (be it the district court or the BAP)." *Id.* (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir. 1997)); *see also In re Carp*, 340 F.3d 15, 21 (1st Cir. 2003) (citing *In re Healthco Int'l, Inc.*, 132 F.3d at 107) ("Notwithstanding the fact that [this Court is] the second-in-time reviewer[], [this Court] cede[s] no special deference to the district court's determinations.").

On the instant appeal, the pertinent facts are not in dispute; thus, the issues presented for review are purely issues of law. The principal issue on appeal centers on the Bankruptcy Court's subject matter jurisdiction to enter the Orders in favor of Dr. Gupta and Mr. Munger as against Steward. "Whether the bankruptcy court had subject matter jurisdiction is a legal question subject to *de novo* review." *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007). As such, this Court should "'cede no special deference to the intermediate decision,'

16

focusing instead on the bankruptcy court's decision." *In re Vazquez Laboy*, 647 F.3d 367, 373 (1st Cir. 2011) (quoting *In re Hill*, 562 F.3d 29, 32 (1st Cir. 2009)).

II.    The Bankruptcy Court Had Subject Matter Jurisdiction to Hear the Motions and Enter the Orders.

   a. *The District Court Erred as a Matter of Law When it Engaged in a "Related To" Analysis.*

"Bankruptcy jurisdiction is governed principally by statute." *In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 105 (1st Cir. 2005). "The general grant of bankruptcy jurisdiction is contained in 28 U.S.C. § 1334." *Id.* "That provision vests original jurisdiction in the district courts over 'all civil proceedings arising under title 11, or arising in or related to cases under title 11.'" *Id.* (citing 28 U.S.C. § 1334(b)). "In what is a typical arrangement, the District of Massachusetts, by standing order, has delegated to the bankruptcy court all cases in which jurisdiction is premised on section 1334, *see* LR, D. Mass. 201, subject to review by the district court (or, alternatively, by the bankruptcy appellate panel) in accordance with 28 U.S.C. §§ 157, 158." *Id.*

As this Court has recognized, "[t]he dividing line is unclear between proceedings that 'arise under' as opposed to 'arise in' and as opposed to 'relate to' title 11." *In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d 61, 68 (1st Cir. 2002). Although "[t]he statute itself provides no definitions … it is commonly said that 'arising under' proceedings are (at least) those cases in which the cause of

17

action is created by title 11. *Id.* (citations omitted). "'Arising in' proceedings generally 'are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.'" *Id.* (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987)) (further citations omitted). "By contrast, this court has defined 'related to' proceedings as proceedings which ''potentially have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate.''" *Id.* (quoting *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991) (quoting *Smith v. Commercial Banking Corp. (In re Smith)*, 866 F.2d 576, 580 (3d Cir. 1989))). "'Arising under' and 'arising in' claims are both considered to be 'core' bankruptcy proceedings, while 'related to' claims are considered to be 'non-core' proceedings." *Lothian Cassidy, LLC v. Lothian Exploration & Dev. II, L.P.*, 487 B.R. 158, 162 (S.D.N.Y.2013) (citing *Shiboleth v. Yerushalmi*, 412 B.R. 113, 116 (S.D.N.Y.2009)); *see also Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).[6]

---

[6] "Although whether something is a core proceeding [under 28 U.S.C. § 157(b)] is analytically separate from whether there is jurisdiction [under 28 U.S.C. §1334], by definition all core proceedings are within the bankruptcy court's jurisdiction." *In re Toledo*, 170 F.3d 1340, 1350, n.6 (11th Cir. 1999). "Core proceedings are defined in 28 U.S.C. § 157(b)(1) as 'proceedings arising under title 11, or arising in a case under title 11,' which is a subset of the cases over which jurisdiction is granted in § 1334(b)." *Id.*

18

Dr. Gupta and Mr. Munger submit that the District Court erred as a matter of law when it considered the "key question … [to be] whether [Mr.] Munger's and [Dr.] Gupta's claims against Steward [we]re '*related to*' [QMC's] bankruptcy proceeding." *Quincy Med. Ctr. v. Gupta, et al*., 2015 WL 58633, at *3 (D.Mass. Jan. 5, 2015) (emphasis supplied).[7]  First in this respect, the District Court was incorrect when it held that "the bankruptcy court did not determine whether the disputes on appeal were core proceedings." *Id.* at *3, n.5.[8]  To the contrary, the Bankruptcy Court implicitly determined that the disputes were "core" proceedings (*i.e.*, "arising under" or "arising in" proceedings) when it expressly recognized its "jurisdiction to interpret and enforce its own prior orders." *In re Quincy Med. Ctr., Inc. (QMC I)*, 466 B.R. 26, 32 (Bankr.D.Mass. 2012) (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009); *First Marblehead Corp. v. Education Resources Institute, Inc*., 463 B.R. 151, 158–159 (D.Mass. 2011)).[9]  A "Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders", as long as "the Bankruptcy Court had subject-matter jurisdiction to enter the [orders]" in the first place. *Travelers Indem. Co.*, 557 U.S. 137, 129 S. Ct. at 2205, 174 L. Ed. 2d 99 (2009); *see also In re G.S.F. Corp.*, 938 F.3d 1467, 1475-1477 (1st Cir.1991) (where bankruptcy court had jurisdiction to

---

[7]  *See also Add.* at 55.
[8]  *See also Add.* at 55.
[9]  *See also Add.* at 28.

approve settlement, jurisdiction over subsequent litigation involving settlement was based on the inherent power of the court to protect a federal judgment, and did not require showing an "effect on the debtor").

It cannot be questioned, nor has it been questioned, that the Bankruptcy Court possessed subject matter jurisdiction to hear and determine the Sale Motion and enter the Sale Order pursuant to 28 U.S.C §§ 157 and 1334, as determination of the Sale Motion and entry of the Sale Order are "core" proceedings expressly enumerated under 28 U.S.C. § 157(b)(2).  In fact, the Sale Order itself explicitly sets forth the Bankruptcy Court's "jurisdiction to hear and determine the Sale Motion … pursuant to 28 U.S.C. §§ 157 and 1134 [sic]."  *App.* at 590.  Thus, "[b]ecause interpreting and enforcing an order resulting from a prior 'core proceeding' also constitutes a 'core proceeding'", it was wrong for the District Court to "assume" that these were "non-core proceedings" merely "related to" QMC's bankruptcy proceeding.  *White v. Kubotek Corp., et al.*, 487 B.R. 1, 7 (D. Mass. 2012), *aff'd*, No. 13-1290 (1st Cir. Sept. 24, 2013).  "'Related to' jurisdiction has nothing to do with the issues here."  *In re Motors Liquidation Co.*, 514 B.R. 377, 381 (Bankr. S.D.N.Y. 2014).  As explained further below, "[b]ankruptcy courts … have subject matter jurisdiction to enforce their orders in bankruptcy cases and proceedings under [its] 'arising in' jurisdiction."  *Id.*

What is more, the Bankruptcy Court further recognized its jurisdiction "to

hear and rule upon disputes arising from the sale by QMC to Steward" given that such jurisdiction "is expressly reserved in the [Sale Order]." *In re Quincy Med. Ctr., Inc. (QMC II)*, 479 B.R. 229, 234-235 (Bankr. D. Mass. 2012)[10]; *see also Travelers Indem. Co.*, 557 U.S. 137, 129 S.Ct. at 2205, 174 L.Ed.2d 99 (bankruptcy court had jurisdiction to interpret and enforce its prior order, particularly where prior order explicitly retained jurisdiction); *First Marblehead Corp.*, 463 B.R. at 158–159 (bankruptcy court had subject matter jurisdiction to interpret its prior order that authorized and approved the terms of the agreement and retained jurisdiction to construe and enforce those terms); *In re The Education Resources Institute, Inc.*, 442 B.R. 20, 24–25 (Bankr.D.Mass.2010) (bankruptcy court had subject matter jurisdiction to construe and interpret terms of agreement executed by Chapter 11 debtor and another entity where the order that authorized debtor to enter into the agreement and that approved the terms of the agreement specifically reserved jurisdiction in the court to adjudicate related disputes).

Given that the Sale Order, as well as the APA, specifically reserved jurisdiction in the Bankruptcy Court to adjudicate disputes such as the ones presented by Dr. Gupta and Mr. Munger in their Motions, which order the

---

[10] *See also Add.* at 41. Moreover, the jurisdiction of the Bankruptcy Court to resolve disputes arising from the sale by QMC to Steward was also specifically reserved in the APA, *App.* at 305, the Debtors' Joint Plan of Liquidation Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"), *App.* at 1069-1071, and the Confirmation Order. *App.* at 1021.

Bankruptcy Court indisputably had jurisdiction to enter, all the more reason that the Bankruptcy Court possessed jurisdiction to interpret and enforce the Sale Order, together with the provisions of the APA, in order to resolve the Motions.[11] *See In re The Education Resources Institute, Inc.*, 442 B.R. at 25.

Moreover, the District Court further compounded its error in this regard when it held that "the parties … agree[d] that the[ Motions] are not [core proceedings]" and thus "assume[d] that the[y] [we]re non-core proceedings." *Quincy Med. Ctr. v. Gupta, et al*., 2015 WL 58633, at *3, n.5 (D.Mass. Jan. 5, 2015).[12] Dr. Gupta and Mr. Munger have not conceded that their Motions were "non-core" proceedings. Rather, it was Steward who contended, for the first time on appeal, that the Motions and related proceedings were "non-core" proceedings.

---

[11] There is no question that the Sale Order did not merely authorize QMC and Steward to enter into the APA, but it also approved the terms of the APA and retained jurisdiction to construe and enforce those terms. *App.* at 598; 612. Similarly, the APA, which was attached to the Sale Motion and reviewed by the Bankruptcy Court before it entered the Sale Order, provides that:

> [there] shall be an order … of the Bankruptcy Court … approving [the APA] and all of the terms and conditions [t]hereof, and approving and authorizing QMC to consummate the [sale]. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that … the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to [the APA].

*App.* at 244. Accordingly, the Bankruptcy Court not only had jurisdiction to construe and interpret its prior Sale Order, but it also had jurisdiction to construe and interpret the terms of the APA, such jurisdiction also having been specifically retained in the Sale Order.

[12] *See also Add.* at 55.

*Id.* at *3 (citing Steward Brief at 11). In fact, Dr. Gupta's and Mr. Munger's Motions, which sought allowance of administrative expense claims pursuant to 11 U.S.C 503(b)(1), are "core" proceedings in and of themselves under 28 U.S.C. § 157(b)(2), and thus fall squarely within the Bankruptcy Court's "arising in" jurisdiction. *See Lothian Cassidy, LLC*, 487 B.R. at 62. Therefore, the District Court's entire analysis and ultimate holding regarding the Bankruptcy Court's lack of subject matter jurisdiction are based on false assumptions.

The District Court (and Steward) failed to recognize that the Bankruptcy Court's subject matter jurisdiction here is not based on "related to" jurisdiction. Rather, and as explained further below, "it exists by reason of 'arising in' jurisdiction, by reason of the [Bankruptcy] Court's earlier orders in this case (which, without dispute, were entered in connection with a core function), and the need to enforce them." *In re Ames Dep't Stores, Inc.*, 317 B.R. 260, 269 (Bankr. S.D.N.Y. 2004). For these reasons, the District Court's Decision should be reversed.

> b. *The Bankruptcy Court Had Subject Matter Jurisdiction Because Dr. Gupta's and Mr. Munger's Claims "Arose In" Title 11.*

As touched upon above, the Bankruptcy Court had subject matter jurisdiction to hear the Motions and enter the Orders because the proceedings 'arose in' a case under title 11. *See* 11 U.S.C. § 1334(b); *see also In re Texaco Inc.*, 182 B.R. 937, 944 (Bankr. S.D.N.Y. 1995) ("a proceeding … to enforce and

23

construe a[n] … order issued by this Court in this case, constitutes a proceeding 'arising in … a case under title 11.'").  Again, "'[a]rising in' proceedings generally 'are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.'"  *In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d at 68 (quoting *In re Wood*, 825 F.2d at 96).

Here, "[t]he underlying dispute [] involves a[n]… interpretation of a sale order" entered pursuant to 11 U.S.C. §§ 363 and 365, "an order that can only be issued by a bankruptcy court, and so it is one that arises in a case under title 11." *In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d at 68.  "Both [M]otions filed by [Dr. Gupta and Mr. Munger] assert that Steward violated the terms of the APA by not offering them employment post-closing."  *QMC I* at 32.[13]  "Although framed as state law claims, [Dr. Gupta and Mr. Munger's Motions] depend on an interpretation of the Bankruptcy Court's Sale Order" that authorized and approved the terms of the APA and also retained jurisdiction to construe and enforce those terms.  *White*, 487 B.R. at 7; *see also Lothian Cassidy, LLC*, 487 B.R. at 162 ("the fact that Plaintiffs' claims are rooted in common law and name only non-debtors as defendants does not preclude ['arising in'] jurisdiction. Common-law claims closely connected with the administration of the bankruptcy can qualify as 'arising

---

[13]  *See also Add.* at 28; *App.* at 636-653; 685-718; 910-914.

24

in' a bankruptcy even though they may, in a literal sense, be brought outside a bankruptcy action.").

Because Dr. Gupta and Mr. Munger are claiming that Steward violated the terms of the APA, which was part and parcel of the Sale Motion and the Bankruptcy Court's Sale Order, the Motions "would not exist but for the bankruptcy … and so [they] arise[] in a case under title 11." *In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d at 68; *see also White,* 487 B.R. at 7 (finding that bankruptcy court had subject matter jurisdiction to adjudicate claims for successor liability and fraudulent conveyance brought by unsecured creditor against purchaser of debtor's assets; although framed as state law claims, both claims depended on interpretation of bankruptcy court's sale order and an attack on its legitimacy, fraudulent conveyance claim had no existence outside bankruptcy because transaction was authorized by sale order, successor liability claim also was governed by "free and clear" sale order, and so both claims "arose in" Title 11)[14]; *In re Millenium Seacarriers, Inc.*, 458 F.3d 92 (2d Cir. 2006) (underlying action between ultimate purchase of property against holder of assumed contracts, which

---

[14] As referenced *infra*, on September 24, 2013, this Court affirmed the *White* decision "for the reasons given by the district court in it memorandum and order, dated October 2, 2012." *App.* at 1580-1599. Therefore, Dr. Gupta and Mr. Munger submit that the *White* decision is *stare decisis*. *See, e.g., Gately v. Com. of Mass.*, 2 F.3d 1221, 1226 (1st Cir. 1993) ("The doctrine of *stare decisis* renders the ruling of law in a case binding in future cases before the same court or other courts owing obedience to the decision.").

turns on the terms of the Sale Order, amounts to a request that the bankruptcy court enforce that order, thus, the action was a core proceeding and the bankruptcy court's initial decision to exercise jurisdiction over that action was proper); *In re Petrie Retail, Inc.*, 304 F.3d 223 (2d Cir. 2002) (holding that core jurisdiction existed over a dispute between entities that had been involved in a reorganization proceeding (albeit not as debtors) over interpretation of the bankruptcy court's sale order).

As determined by the Bankruptcy Court, "[b]y virtue of the Sale Order, which was not appealed, Dr. Gupta and Mr. Munger, employees of QMC on the date of that order, and Steward are bound by the Sale Order and the provisions of the APA."[15] *QMC I* at 32.[16] After interpreting those provisions, the Bankruptcy Court ultimately found Steward liable to each of Dr. Gupta and Mr. Munger for the amounts sought in their Motions for its breach of the terms of the APA in not offering them employment post-closing. *QMC II* at 237.[17]

As Dr. Gupta's and Mr. Munger's Motions were entirely based upon the Bankruptcy Court-ordered sale and necessarily required construction and enforcement of the Bankruptcy Court's Sale Order and the APA, "[t]here can be no

---

[15] It is worth noting that the Supreme Court has indicated "that bankruptcy courts are entitled to substantial deference in the interpretation of their own orders." *First Marblehead Corp.*, 463 B.R. at 157 (citing *Travelers Indem. Co.*, 557 U.S. 137, 129 S.Ct. at 2205, 174 L.Ed.2d 99).

[16] *See also Add.* at 28.

[17] *See also Add.* at 46-47

question that a proceeding such as this … constitutes a proceeding 'arising in'… title 11." *In re Texaco Inc.*, 182 B.R. at 944.; *see also In re Ames Dep't Stores, Inc.*, 317 B.R. at 269 ("a proceeding 'arises in' a bankruptcy case when it would have no practical existence but for the bankruptcy. Efforts to implement, gain the fruits of, and to enforce orders of the bankruptcy court are all in this category.").

Given that "the Bankruptcy Court clearly had 'arising in' jurisdiction, this Court need not determine whether it also had 'arising under' or 'related to' jurisdiction." *White*, 487 B.R. at 7.  For these reasons, the District Court's holding that the Bankruptcy Court lacked subject matter jurisdiction to issue the Orders should be reversed.

III.    The Bankruptcy Court Had Statutory Authority to Hear the Motions and Enter the Orders.[18]

As outlined above, "bankruptcy courts have subject-matter jurisdiction to hear all civil proceedings arising under, in or related to Title 11." *White*, 487 B.R. at 7 (citing 28 U.S.C. § 1334(b)).  "Their statutory authority to issue final orders, however, is not coextensive with their jurisdiction."  *Id.*  "A bankruptcy court may enter a final order only in 'core' proceedings or 'non-core' proceedings in which

---

[18] In that the District Court vacated the Bankruptcy Court's Orders solely on the ground that it lacked subject matter jurisdiction pursuant to 28 U.S.C. § 1334, which it clearly did not, Dr. Gupta and Mr. Munger submit that this Court may cease its review at this stage and, for the reasons set forth above, reverse the District Court's decision accordingly.  However, in an effort to address any ancillary jurisdictional issues, Dr. Gupta and Mr. Munger provide additional analysis in the event this Court deems it necessary.

the parties have consented to the entry of a final order." *Id.* (citing 28 U.S.C. §§ 157(b)(1), 157(c)(2)).  Additionally, "[a] bankruptcy court also has authority to issue any order, process or judgment that is 'necessary or appropriate to carry out' a prior order." *Id.* (citing 11 U.S.C. § 105(a)).

Pursuant to 28 U.S.C. § 157(b)(2), "[c]ore proceedings include, but are not limited to", the sixteen (16) kinds of cases enumerated therein.  28 U.S.C. § 157(b)(2).  "This statutory provision prescribes a non-exhaustive exemplar of core proceedings." *In re Sheridan*, 362 F.3d 96, 106-07 (1st Cir.2004).  "Under 28 U.S.C. § 157(b)(2)(N), the bankruptcy court's issuance of a sale order of property to third parties who have not filed a claim against the estate qualifies as a core proceeding" *White*, 487 B.R. at 7 (citing 28 U.S.C. § 157(b)(2)(N)), as does the "allowance or disallowance of claims against the estate."  28 U.S.C. § 157(b)(2)(B).

Here, "[t]he Bankruptcy Court had statutory authority to rule because interpreting and enforcing an order resulting from a prior 'core proceeding' also constitutes a 'core proceeding.'" *White*, 487 B.R. at 7.  The Sale Order, in which the Bankruptcy Court approved the sale of substantially all of QMC's assets to Steward pursuant to 11 U.S.C. §§ 363 and 365, "was a 'core' proceeding according to the plain language of 28 U.S.C. § 157(b)(2)(N)." *Id.* at 7-8.  In fact, the Sale Order itself expressly sets forth that that "[d]etermination of the Sale Motion is a

28

core proceeding under 28 U.S.C. 157(b)(2)" *App.* at 591.  Moreover, Dr. Gupta

and Mr. Munger's Motions, which originally sought allowance of administrative

expense claims against QMC pursuant to 11 U.S.C. 503(b)(1), were also core

proceedings under 28 U.S.C. §157(b)(B).

     As discussed *supra*, the claims brought by Dr. Gupta and Mr. Munger in

their Motions "hinge on the interpretation and enforcement of the Bankruptcy

Court's order in that core proceeding." *White*, 487 B.R. at 8.  Thus, the Bankruptcy

Court had statutory authority to entertain litigation that required such interpretation

and enforcement of its prior order, including the APA, "because doing so was

'necessary' to carry out the Sale Order."  *Id.*; *see also In re Texaco, Inc.* 182 B.R. at

943–44 (bankruptcy court's interpretation and enforcement of a previous order is a

"core" proceeding); *In re Kiker*, 98 B.R. 103, 103–04 (Bankr.N.D.Ga. 1988)

(same)).

     Notwithstanding, Steward argued below that as a result of the Supreme

Court's decision in *Stern*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), the Bankruptcy

Court lacked the authority to enter final judgments (*i.e.*, the Orders)[19] because the

---

[19]   Steward has also contested the finality of the Orders themselves.  While
Steward's appeal to the District Court was pending, Dr. Gupta and Mr. Munger
filed a Joint Motion for Post-Judgment Real Estate Attachment and Injunction
seeking security from Steward for the amounts awarded to them in the Orders.
*App.* at 1178-1180; 1181-1209 (the "Security Motion").  The Security Motion was
precipitated by reports in the news media that Steward had announced its intention
to close Quincy Medical Center on December 31, 2014, and that its decision was

29

proceedings no longer qualify as "core" after *Stern*. *See* Steward Brief, at 15-16.[20]

"To the extent that *Stern* alters the analysis of what constitutes a 'core' proceeding, the Bankruptcy Court still had statutory authority to issue the [Sale] Order in this case." *White*, 487 B.R. at 8. "In *Stern*, the Supreme Court stressed that determinations as to whether a proceeding is core and whether it 'arises in' Title 11 are one and the same." *Id.* (citing *Stern*, 131 S.Ct. at 2605) ("Under our reading of the statute, core proceedings are those that arise in a bankruptcy case or under Title

_____

the result of serious financial losses. *Id.* In opposing the Security Motion, Steward did not attempt to convince anyone that it would be good for the money should the Orders be upheld on appeal. Instead, Steward argued that Mr. Munger and Dr. Gupta have no right to post-judgment security because the Orders are not judgments and even if they are judgments they are not money judgments, which are the kind entitled to security. *App.* at 1210-1219 (Steward Objection to Security).

On December 29, 2014, however, the Bankruptcy Court issued a Memorandum of Decision on Joint Motion of Victor Munger and Apurv Gupta, M.D. for Post Judgment Real Estate Attachment and Injunction holding, among other things, that the Orders are final, money judgments, which Steward itself acknowledged when it appealed the Orders to the District Court, and required Steward to post a bond accordingly. *In re Quincy Med. Ctr., Inc.*, 2014 WL 7399088, at *2 (Bankr.D.Mass. Dec. 29, 2014) ("Fed. R. Bank. P. 9001(7) defines a judgment as 'any appealable order.' In appealing, Stewart [sic] has in effect acknowledged that the orders are judgments."). Steward's bond, however, was never actually posted given that the District Court issued its Decision prior to the required posting date.

[20] In the same breath, however, "Steward also acknowledge[d] that … Local Rule 206 [LR, D. Mass. 206] treats a bankruptcy court's purported final orders as proposed findings of fact and conclusions of law in the event that the bankruptcy court so lacked jurisdiction." Steward Brief, at 15. In that LR, D. Mass. 206, by its title, applies to "core" proceedings, and given that "*Stern* claims" are claims that are "core" under section 157(b)(2), it seems as if Steward may have correctly recognized that the Motions and the Orders were "core" proceedings.

11.")).  Although "the *Stern* Court held that if a proceeding is core, it must 'arise in' a case under Title 11", it "did not address the issue of whether a proceeding that 'arises in' a Title 11 case is core."  *Id.* (citing *Stern*, 131 S.Ct at 2605).  However, this Court "has indicated that proceedings that 'arise in' a case under Title 11 are core."  *Id.* (citing *In re G.S.F. Corp.*, 938 F.2d at 1475) ("Core proceedings involve rights created by the Bankruptcy Act, they depend on the Bankruptcy Act for their existence.... Related proceedings do not arise under the Bankruptcy Act.")).

In determining whether the Bankruptcy Court had subject matter jurisdiction to hear the Motions and enter the Orders, it has been established herein that the proceedings "arise in" a case under title 11. "Therefore, the [underlying] proceedings are core and the Bankruptcy Court, by statute, ha[d] authority to issue a final order."  *White*, 487 B.R. at 8.  In addition, "to the extent that the *Stern* Court consolidated the jurisdictional and 'core' inquiries, it is well-settled that a bankruptcy court has statutory jurisdiction to decide matters pertaining to enforcement of its prior orders."  *Id.* (citing *Travelers Indem. Co.*, 557 U.S. 137, 151, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009)); *see also* 11 U.S.C. § 105(a).  Since the Bankruptcy Court clearly had subject matter jurisdiction to interpret the Sale Order and the APA, it follows that the Motions and Orders also falls within the "core" category.  *Id.*

31

IV.     The Bankruptcy Court Did Not Violate Article III When it Heard the Motions and Entered the Orders, As Steward Knowingly and Voluntarily Consented to Such Adjudication.

Although the District Court also did not reach this issue, as its Decision was confined to whether the Bankruptcy Court had subject matter jurisdiction under 28 U.S.C. § 1334(b), in that Steward has previously raised the "*Stern* claim" issue, Dr. Gupta and Mr. Munger wish to address it, and dismiss it, especially in light of the Supreme Court's recent holding in *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015).

"In *Stern v. Marshall*, the Supreme Court held that an Article I bankruptcy judge lacks constitutional authority to enter final judgment on a state law counterclaim not resolved in the creditor's proof of claim process even though the claim was properly designated as 'core'". *White*, 487 B.R. at 9 (citing *Stern*, 131 S.Ct. at 2611).  Although the *Stern* Court stressed that the holding was "narrow", and that it would "not meaningfully change [ ] the division of labor" between district courts and bankruptcy courts", 131 S.Ct. at 2620, a mass of litigation erupted regarding so-called "*Stern* claims."  *See Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2170, 189 L. Ed. 2d 83 (2014) ("'Stern claims'—a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter.").  While the Supreme Court in *Stern*, "held that Article III prohibits Congress from vesting a

32

bankruptcy court with the authority to finally adjudicate certain claims", it did not specifically address how courts should proceed when they encounter one of these "Stern claims". *Arkison*, 134 S. Ct. at 2170.

Typically, in determining whether a bankruptcy court has jurisdiction to issue a final order on a "*Stern* claim", it must first be determined "whether the bankruptcy court has statutory authority under the bankruptcy code, which effectively involves consideration of whether a proceeding is 'core' or not." *White*, 487 B.R. at (citing *Stern*, 131 S.Ct. at 2604–05; *In re Ortiz*, 665 F.3d 906, 911–12 (7th Cir. 2011); *In re Lacey*, 2011 WL 5117767 at *5 (Bankr.D.Mass. 2011)). Second, if a proceeding is "core", it must be determined "whether the bankruptcy court nonetheless lacks constitutional authority to issue a final order." *Id.* (citing *Stern*, 131 S.Ct. at 2608).[21]

---

[21]   Regarding "non-core" proceedings under 28 U.S.C. § 157(c), which, as explained *supra*, are not relevant here as the Motions and Orders are "core" proceedings under section 157(b)(2), merely for context, the Supreme Court in *Arkison* explained as follows:

> As for 'non-core' proceedings—*i.e.*, proceedings that are 'not ... core' but are 'otherwise related to a case under title 11'—the statute authorizes a bankruptcy court to 'hear [the] proceeding,' and then 'submit proposed findings of fact and conclusions of law to the district court.' [28 U.S.C.] § 157(c)(1). The district court must then review those proposed findings and conclusions *de novo* and enter any final orders or judgments. *Id.* There is one statutory exception to this rule: If all parties 'consent,' the statute permits the bankruptcy judge 'to hear and determine and to enter appropriate orders and judgments' as if the proceeding were core. [28 U.S.C.] § 157(c)(2).

33

As discussed *supra*, the Bankruptcy Court's hearing of the Motions and entry of the Orders were "core" proceedings; therefore, this at least raises the specter that a *Stern* analysis may be necessary, and Steward has raised such an argument before. *See* Steward Brief, at 15. While Dr. Gupta and Mr. Munger in no way concede that their claims against Steward are "*Stern* claims", assuming, purely for the sake of argument, that their claims were in fact "*Stern* claims", there is no need to bog this Court down with a *Stern* analysis given Supreme Court's recent decision in *Wellness*. 135 S.Ct. 1932.

Without getting into unnecessary detail, the *Wellness* Court held that Article III permits bankruptcy courts to adjudicate "*Stern* claims" with the parties' knowing and voluntary consent. *Id.* As pointed out in *Wellness*, "the cases in which th[e Supreme Court] has found a violation of a litigant's right to an Article III decisionmaker have involved an objecting defendant forced to litigate involuntarily before a non-Article III court." *Id.* at 1947. However, the Supreme Court has never "h[e]ld that a litigant who has the right to an Article III court may

---

Put simply: If a matter is core, the statute empowers the bankruptcy judge to enter final judgment on the claim, subject to appellate review by the district court. If a matter is non-core, and the parties have not consented to final adjudication by the bankruptcy court, the bankruptcy judge must propose findings of fact and conclusions of law. Then, the district court must review the proceeding *de novo* and enter final judgment.

134 S. Ct. at 2172.

not waive that right through his consent." *Id.* In fact, "[a]djudication based on litigant consent has been a consistent feature of the federal court system since its inception." *Id.* at 1948.

As to the type of consent required to permit a final adjudication by a bankruptcy court (*i.e.*, a non-Article III court), the Supreme Court held that "[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express[,] … [n]or does the relevant statute, 28 U.S.C. § 157, mandate express consent." *Id.* Therefore, the Supreme Court has approved an "implied consent standard" as the "appropriate rule for adjudications by bankruptcy courts under § 157", opining that "'the Article III right is substantially honored' by permitting waiver based on 'actions rather than words'". *Id.* (quoting *Roell v. Withrow*, 538 U.S. 580, 589 123 S.Ct. 1696, 155 L.Ed.2d 775 (2003)). Notwithstanding, "a litigant's consent—whether express or implied—must still be knowing and voluntary." *Id.* For implied consent, the "key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." *Id.* (quoting *Roell*, 538 U.S. at 590, 123 S.Ct. 1696).

Here, Steward undoubtedly consented to adjudication of the Motions and entry of the Orders by the Bankruptcy Court both expressly *and* impliedly. Steward expressly consented to the Bankruptcy Court's jurisdiction to hear and

rule upon disputes arising from the sale by QMC to Steward, as such jurisdiction was expressly reserved not in only the APA, *App.* at 305, which agreement Steward negotiated and was unquestionably a party to, but jurisdiction to hear such disputes was also retained in the Sale Order, *App.* at 598; 612, the Plan, *App.* at 1069-1071 and the Confirmation Order, *App.* at 1021, all of which Steward was fundamentally familiar, if not a direct party to itself.

By way of specific example, the APA provides:

13.2 <u>Submission to Jurisdiction; Consent to Service of Process</u>. Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) *the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court* and shall receive notices at such locations as indicated in Section 13.6; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state court of competent jurisdiction sitting in Norfolk or Suffolk County (Massachusetts) and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.6.
…

36

*App.* at 305 (emphasis supplied).[22]   Moreover, the Sale Order provides in two (2)

distinct instances:

> T.   It is necessary and appropriate, in order to ensure the validity of the sale of them Assets to Steward and to ensure compliance with this Order, for this Court to retain jurisdiction to:  (a) interpret and enforce the provisions of the AP A, the Assigned Agreements, the Sale Motion and this Order; (b) protect Steward and any of the Assets against any Lien or Claim; (c) resolve any disputes arising under or relating to the AP A, the Assigned Agreements, the Sale Motion and this Order; and (d) determine the validity, extent and priority of asserted pre-closing Liens or Claims on, and the disposition of the gross proceed; of sale of, the Assets.
>
> …
>
> 37.   This Court retains jurisdiction to:
>
> a.   Interpret, implement and enforce the terms and provisions of this Order, the APA, and the Assigned Agreements;
>
> b.   Protect Steward and any of the Assets against any Liens or Claims;
>
> c.   Resolve any disputes arising under or relating to the APA, the Assigned Agreements, the Sale Motion, or this Order; and
>
> d.   Adjudicate all issues concerning asserted pre-closing Liens or Claims on, and the disposition of the proceeds of the sale of, the Assets.

*App.* at 598; 612.  The Sale Order additionally provides:

> 30.   *The terms and provisions of the APA, together with the terms and conditions of this Order, shall be binding in all respects upon all entities, including*, without limitation, the Company (including its

---

[22] As of the date the Motions were filed, as well as the date of the filing of this Brief, the QMC Bankruptcy Case has not closed.  *See App.* at 10.

employees, officers and directors), its estates, all creditors and equity interest holders of the Company, *Steward*, and their respective affiliates, successors and assigns, agents and any affected third parties, including, but not limited to, all persons asserting a claim against or interest in any of the Assets to be sold, conveyed or assigned to Steward pursuant to the APA.

*App.* at 610 (emphasis supplied).  As Steward is a large, sophisticated business entity that was represented by able legal counsel throughout QMC's bankruptcy proceeding and its ultimate purchase of QMC's assets, there can be little argument against the fact that Steward expressly consented to the Bankruptcy Court's adjudication of Dr. Gupta's and Mr. Munger's claims and that such consent was knowing and voluntary.

Lastly, *even if* Steward could somehow contend that it did not expressly consent to the jurisdiction of the Bankruptcy Court's adjudication of Dr. Gupta's and Mr. Munger's claims, which it clearly did, Steward also impliedly consented to such adjudication via its litigation conduct and by failing to object to the Bankruptcy Court's adjudication the claims at an earlier juncture.[23]   Instead, Steward voluntarily participated in the Bankruptcy Court's hearing and resolution of the Motions by, among other ways, affirmatively responding to Dr. Gupta and

---

[23] Dr. Gupta and Mr. Munger acknowledge that a party may not consent to subject matter jurisdiction.  *See*, e.g., *Alphas Co. v. Empacadora, GAB, Inc.*, 519 F. App'x 692, 693 (1st Cir.2013) ("a party cannot confer subject matter jurisdiction, otherwise absent, by waiver, consent, or indolence.").  However, this is a separate issue regarding the Bankruptcy Court's authority to render final orders and judgments.

Mr. Munger's Motions with various memoranda and supporting affidavits in opposition thereto, as well as by appearing and arguing its opposition to the Motions at several hearings held by the Bankruptcy Court with objection.  As a result, Steward waived any *Stern* objection it may have had, if any, since "waiver based on 'actions rather than words'" is sufficient to confer authority on the Bankruptcy Court to enter final orders and judgments consistent with the Constitution.  *Wellness*, 135 S.Ct. at 1948 (quoting *Roell*, 538 U.S. at 589).

## CONCLUSION

For the foregoing reasons, Dr. Gupta and Mr. Munger respectfully request that this Court:  (a) reverse and vacate the Memorandum of Decision of the District Court; (b) reinstate the Bankruptcy Court's Orders on the Motion of Apurv Gupta for Allowance of Administrative Expense Claim and the Motion of Victor Munger for Allowance of Administrative Expense Claim entered on September 25, 2014; (c) order Steward to immediately pay Dr. Gupta and Mr. Munger the amounts owed to them pursuant to the Bankruptcy Court's Orders; and (d) grant such other and further relief this Court deems meet and just under the circumstances.

Respectfully submitted,

APURV GUPTA, M.D.

By His Attorneys,


/s/ Leah L. Miraldi
Bruce W. Gladstone, Esq. (#46146)
Leah L. Miraldi, Esq. (#1162715)
Cameron & Mittleman LLP
301 Promenade Street
Providence, RI 02908
(401) 331-5700
bgladstone@cm-law.com
lmiraldi@cm-law.com

*and*

VICTOR MUNGER

By His Attorneys,


/s/ Charles R. Bennett, Jr.
Charles R. Bennett, Jr., Esq. (#35450)
Murphy & King, P.C.
One Beacon Street
Boston, MA 02108
(617) 423-0400
cbennett@murphyking.com

Dated:  June 29, 2015

## <u>CERTIFICATE OF SERVICE</u>

I, Leah L. Miraldi, hereby certify that on the 29th day of June, 2015, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Jonathan W. Young, Esq.
Locke Lord LLP
225 West Wacker Drive
Chicago, IL 60606
jonathan.young@lockelord.com

Scott R. Magee, Esq.
Locke Lord LLP
111 Huntington Avenue
Boston, MA 02199
scott.magee@lockelord.com

Dana G. Hefter, Esq.
Locke Lord LLP
750 Lexington Avenue
New York, NY 10022
dana.hefter@lockelord.com

John T. Morrier, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, MA 02210
morrier@casneredwards.com

Jeffrey D. Sternklar, Esq.
Jeffrey D. Sternklar LLC
225 Franklin Street, 26th Floor
Boston, MA 02110
jeffrey@sternklarlaw.com

Jennifer L. Hertz, Esq.
Office of the U.S. Trustee
5 Post Office Square, Suite 1000
Boston, MA 02109
jennifer.l.hertz@usdoj.gov

/s/ Leah L. Miraldi
Leah L. Miraldi, Esq. (#1162715)
Cameron & Mittleman LLP
301 Promenade Street
Providence, Rhode Island 02908
(401) 331-5700

Dated: June 29, 2015

41

I, Leah L. Miraldi, further certify that on the 29th day of June, 2015, I served a copy of the foregoing document on the following parties or their counsel of record by U.S. mail:

Theodore W. Connolly, Esq.
Looney & Grossman LLP
101 Arch Street, 9th Floor
Boston, MA 02110
tconnolly@lgllp.com

Paul D. Moore, Esq.
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
pdmoore@duanemorris.com

A. Davis Whitesell, Esq.
Casner & Edwards, LLP
303 Congress Street
Boston, MA 02210
whitesell@casneredwards.com

/s/ Leah L. Miraldi
Leah L. Miraldi, Esq. (#1162715)
Cameron & Mittleman LLP
301 Promenade Street
Providence, Rhode Island 02908
(401) 331-5700

Dated:  June 29, 2015

42

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Leah L. Miraldi, hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ☒ this brief contains 10,235 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this brief has been prepared in a proportionally spaced typeface using 14-point Times New Roman in Microsoft Word 2010.


/s/ Leah L. Miraldi
Leah L. Miraldi, Esq. (#1162715)
Cameron & Mittleman LLP
301 Promenade Street
Providence, RI 02908
(401) 331-5700

Dated: June 29, 2015

No. 15-1183
_____

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
_____

IN RE: QUINCY MEDICAL CENTER, INC., QMC ED PHYSICIANS, INC.,
QUINCY PHYSICIANS CORPORATION,
Debtors,

_____

QUINCY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC.,
Appellee,

v.

APURV GUPTA, M.D.; VICTOR MUNGER,
Appellants.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(4:12-cv-40128-RWZ; 4:12-cv-40131-RWZ)

_____

## ADDENDUM OF THE APPELLANTS
## APURV GUPTA M.D. AND VICTOR MUNGER
_____

Bruce W. Gladstone, Esq.
Leah L. Miraldi, Esq.
Cameron & Mittleman LLP
301 Promenade Street
Providence, RI 02908
(401) 331-5700
bgladstone@cm-law.com
lmiraldi@cm-law.com

*Counsel for Apurv Gupta, M.D.*

Charles R. Bennett, Jr., Esq.
Murphy & King, P.C.
One Beacon Street
Boston, MA 02108
(617) 423-0400
cbennett@murphyking.com

*Counsel for Victor Munger*

# <u>TABLE OF CONTENTS</u>

<u>*Statutes and Rules*</u>:

11 U.S.C. § 105 ................................................................................. **<u>1</u>**

11 U.S.C. § 363 ................................................................................. **<u>3</u>**

11 U.S.C. § 365 ................................................................................. **<u>6</u>**

28 U.S.C. § 157 ............................................................................... **<u>15</u>**

28 U.S.C. § 1334 ............................................................................. **<u>18</u>**

District of Massachusetts Local Rule 201 .......................................... **<u>19</u>**

District of Massachusetts Local Rule 206 .......................................... **<u>20</u>**


<u>*Lower Court Decisions and Orders*</u>:

Memorandum of Decision on Motions of Apurv Gupta and Victor Munger for Allowance of Administrative Expense Claims, filed on February 13, 2012 (Hoffman, J.) (U.S.B.C. Docket No. 499) (*In re Quincy Med. Ctr., Inc. (QMC I)*, 466 B.R. 26 (Bankr. D. Mass. 2012)) ................................................. **<u>21</u>**

Order on Motion of Victor Munger for Allowance of Administrative Expense Claim, entered on February 13, 2012 (U.S.B.C. Docket No. 500) ....................... **<u>30</u>**

Order on Motion of Apurv Gupta for Allowance of Administrative Expense Claim, entered on February 13, 2012 (U.S.B.C. Docket No. 501) ................................... **<u>32</u>**

Memorandum of Decision on Motions of Apurv Gupta and Victor Munger for Allowance of Administrative Expense Claims, filed on September 25, 2012 (Hoffman, J.) (U.S.B.C. Docket No. 1035) (*In re Quincy Med. Ctr., Inc. (QMC II)*, 479 B.R. 229 (Bankr.D.Mass. 2012)) ................................................. **<u>34</u>**

Order on Motion of Victor Munger for Allowance of Administrative Expense Claim, entered on September 25, 2012 (U.S.B.C. Docket No. 1036) .................. **<u>48</u>**

Order on Motion of Apurv Gupta for Allowance of Administrative Expense Claim, entered on September 25, 2012 (U.S.B.C. Docket No. 1037) ............................... **49**

Memorandum of Decision, filed on January 5, 2015 (Zobel, J.) (U.S.D.C. Docket No. 26) (*Quincy Med. Ctr. v. Gupta, et al*., 2015 WL 58633 (D.Mass. Jan. 5, 2015)) ................................................................................................................. **50**

Apurv Gupta, M.D.'s and Victor Munger's Joint Notice of Appeal to the United States Court of Appeals for the First Circuit (U.S.D.C. Docket No. 29) ……..… **63**

United States Code Annotated
Title 11. Bankruptcy (Refs & Annos)
Chapter 1. General Provisions (Refs & Annos)

11 U.S.C.A. § 105

§ 105. Power of court

Effective: December 22, 2010
Currentness

**(a)** The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

**(b)** Notwithstanding subsection (a) of this section, a court may not appoint a receiver in a case under this title.

**(c)** The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in title 28. This subsection shall not be interpreted to exclude bankruptcy judges and other officers or employees appointed pursuant to chapter 6 of title 28 from its operation.

**(d)** The court, on its own motion or on the request of a party in interest--

**(1)** shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and

**(2)** unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically, including an order that--

**(A)** sets the date by which the trustee must assume or reject an executory contract or unexpired lease; or

**(B)** in a case under chapter 11 of this title--

**(i)** sets a date by which the debtor, or trustee if one has been appointed, shall file a disclosure statement and plan;

**(ii)** sets a date by which the debtor, or trustee if one has been appointed, shall solicit acceptances of a plan;

**(iii)** sets the date by which a party in interest other than a debtor may file a plan;

Case:CE54183-1180cumPostu09At68562P5geP5ge: 54ate Filed:File06/29/20/29/2015ntry EntsyID:8735918829

**(iv)** sets a date by which a proponent of a plan, other than the debtor, shall solicit acceptances of such plan;

**(v)** fixes the scope and format of the notice to be provided regarding the hearing on approval of the disclosure statement; or

**(vi)** provides that the hearing on approval of the disclosure statement may be combined with the hearing on confirmation of the plan.

## CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2555; Pub.L. 98-353, Title I, § 118, July 10, 1984, 98 Stat. 344; Pub.L. 99-554, Title II, § 203, Oct. 27, 1986, 100 Stat. 3097; Pub.L. 103-394, Title I, § 104(a), Oct. 22, 1994, 108 Stat. 4108; Pub.L. 109-8, Title IV, § 440, Apr. 20, 2005, 119 Stat. 114; Pub.L. 111-327, § 2(a)(3), Dec. 22, 2010, 124 Stat. 3557.)

Notes of Decisions (1504)

11 U.S.C.A. § 105, 11 USCA § 105
Current through P.L. 114-9 approved 4-7-2015

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 3. Case Administration (Refs & Annos)
      Subchapter IV. Administrative Powers

11 U.S.C.A. § 363

§ 363. Use, sale, or lease of property

Effective: December 22, 2010
Currentness

**(a)** In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

**(b)(1)** The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless--

  **(A)** such sale or such lease is consistent with such policy; or

  **(B)** after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease--

    **(i)** giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

    **(ii)** finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

**(2)** If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then--

  **(A)** notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

  **(B)** notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended--

**(i)** pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

**(ii)** pursuant to subsection (g)(2) of such section; or

**(iii)** by the court after notice and a hearing.

**(c)(1)** If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

**(2)** The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless--

**(A)** each entity that has an interest in such cash collateral consents; or

**(B)** the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

**(3)** Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

**(4)** Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

**(d)** The trustee may use, sell, or lease property under subsection (b) or (c) of this section--

**(1)** in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust; and

**(2)** only to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.

**(e)** Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

**(f)** The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--

    **(1)** applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    **(2)** such entity consents;

    **(3)** such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    **(4)** such interest is in bona fide dispute; or

    **(5)** such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

**(g)** Notwithstanding subsection (f) of this section, the trustee may sell property under subsection (b) or (c) of this section free and clear of any vested or contingent right in the nature of dower or curtesy.

**(h)** Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if--

    **(1)** partition in kind of such property among the estate and such co-owners is impracticable;

    **(2)** sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

    **(3)** the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

    **(4)** such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

**(i)** Before the consummation of a sale of property to which subsection (g) or (h) of this section applies, or of property of the estate that was community property of the debtor and the debtor's spouse immediately before the commencement of the case, the debtor's spouse, or a co-owner of such property, as the case may be, may purchase such property at the price at which such sale is to be consummated.

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 3. Case Administration (Refs & Annos)
      Subchapter IV. Administrative Powers

11 U.S.C.A. § 365

§ 365. Executory contracts and unexpired leases

Currentness

**(a)** Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

**(b)(1)** If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--

**(A)** cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

**(B)** compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

**(C)** provides adequate assurance of future performance under such contract or lease.

**(2)** Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to--

**(A)** the insolvency or financial condition of the debtor at any time before the closing of the case;

**(B)** the commencement of a case under this title;

**(C)** the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

**(D)** the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

**(3)** For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance--

**(A)** of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

**(B)** that any percentage rent due under such lease will not decline substantially;

**(C)** that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

**(D)** that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

**(4)** Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease.

**(c)** The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--

**(1)(A)** applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

**(B)** such party does not consent to such assumption or assignment; or

**(2)** such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor; or

**(3)** such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.

[**(4)** Repealed. Pub.L. 109-8, Title III, § 328(a)(2)(C), Apr. 20, 2005, 119 Stat. 100]

**(d)(1)** In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

**(2)** In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

**(3)** The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

**(4)(A)** Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of--

    **(i)** the date that is 120 days after the date of the order for relief; or

    **(ii)** the date of the entry of an order confirming a plan.

**(B)(i)** The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

**(ii)** If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

**(5)** The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f). Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

[**(6) to (9)** Repealed. Pub.L. 109-8, Title III, § 328(a)(3)(A), Apr. 20, 2005, 119 Stat. 100]

**[(10)** Redesignated (5)]

**(e)(1)** Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on--

**(A)** the insolvency or financial condition of the debtor at any time before the closing of the case;

**(B)** the commencement of a case under this title; or

**(C)** the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

**(2)** Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--

**(A)(i)** applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

**(ii)** such party does not consent to such assumption or assignment; or

**(B)** such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

**(f)(1)** Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

**(2)** The trustee may assign an executory contract or unexpired lease of the debtor only if--

**(A)** the trustee assumes such contract or lease in accordance with the provisions of this section; and

**(B)** adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

**(3)** Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under

such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

**(g)** Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease--

**(1)** if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or

**(2)** if such contract or lease has been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title--

**(A)** if before such rejection the case has not been converted under section 1112, 1208, or 1307 of this title, at the time of such rejection; or

**(B)** if before such rejection the case has been converted under section 1112, 1208, or 1307 of this title--

**(i)** immediately before the date of such conversion, if such contract or lease was assumed before such conversion; or

**(ii)** at the time of such rejection, if such contract or lease was assumed after such conversion.

**(h)(1)(A)** If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and--

**(i)** if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

**(ii)** if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

**(B)** If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

**(C)** The rejection of a lease of real property in a shopping center with respect to which the lessee elects to retain its rights under subparagraph (A)(ii) does not affect the enforceability under applicable nonbankruptcy law of any provision in the lease pertaining to radius, location, use, exclusivity, or tenant mix or balance.

**(D)** In this paragraph, "lessee" includes any successor, assign, or mortgagee permitted under the terms of such lease.

**(2)(A)** If the trustee rejects a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller and--

**(i)** if the rejection amounts to such a breach as would entitle the timeshare interest purchaser to treat the timeshare plan as terminated under its terms, applicable nonbankruptcy law, or any agreement made by timeshare interest purchaser, the timeshare interest purchaser under the timeshare plan may treat the timeshare plan as terminated by such rejection; or

**(ii)** if the term of such timeshare interest has commenced, then the timeshare interest purchaser may retain its rights in such timeshare interest for the balance of such term and for any term of renewal or extension of such timeshare interest to the extent that such rights are enforceable under applicable nonbankruptcy law.

**(B)** If the timeshare interest purchaser retains its rights under subparagraph (A), such timeshare interest purchaser may offset against the moneys due for such timeshare interest for the balance of the term after the date of the rejection of such timeshare interest, and the term of any renewal or extension of such timeshare interest, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such timeshare plan, but the timeshare interest purchaser shall not have any right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

**(i)(1)** If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.

**(2)** If such purchaser remains in possession--

**(A)** such purchaser shall continue to make all payments due under such contract, but may, [1] offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and

**(B)** the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

**(j)** A purchaser that treats an executory contract as terminated under subsection (i) of this section, or a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid.

Case: 15-4185 Document 003112062525 Page: 64 Date Filed: 08/20/2015 Entry ID: 5918829

**(k)** Assignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

**(l)** If an unexpired lease under which the debtor is the lessee is assigned pursuant to this section, the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant.

**(m)** For purposes of this section 365 and sections 541(b)(2) and 362(b)(10), leases of real property shall include any rental agreement to use real property.

**(n)(1)** If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect--

    **(A)** to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

    **(B)** to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for--

        **(i)** the duration of such contract; and

        **(ii)** any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

**(2)** If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract--

    **(A)** the trustee shall allow the licensee to exercise such rights;

    **(B)** the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph (1)(B) of this subsection for which the licensee extends such contract; and

    **(C)** the licensee shall be deemed to waive--

        **(i)** any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and

        **(ii)** any claim allowable under section 503(b) of this title arising from the performance of such contract.

**(3)** If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, then on the written request of the licensee the trustee shall--

    **(A)** to the extent provided in such contract, or any agreement supplementary to such contract, provide to the licensee any intellectual property (including such embodiment) held by the trustee; and

    **(B)** not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.

**(4)** Unless and until the trustee rejects such contract, on the written request of the licensee the trustee shall--

    **(A)** to the extent provided in such contract or any agreement supplementary to such contract--

        **(i)** perform such contract; or

        **(ii)** provide to the licensee such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law) held by the trustee; and

    **(B)** not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment), including any right to obtain such intellectual property (or such embodiment) from another entity.

**(o)** In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

**(p)(1)** If a lease of personal property is rejected or not timely assumed by the trustee under subsection (d), the leased property is no longer property of the estate and the stay under section 362(a) is automatically terminated.

**(2)(A)** If the debtor in a case under chapter 7 is an individual, the debtor may notify the creditor in writing that the debtor desires to assume the lease. Upon being so notified, the creditor may, at its option, notify the debtor that it is willing to have the lease assumed by the debtor and may condition such assumption on cure of any outstanding default on terms set by the contract.

    **(B)** If, not later than 30 days after notice is provided under subparagraph (A), the debtor notifies the lessor in writing that the lease is assumed, the liability under the lease will be assumed by the debtor and not by the estate.

**(C)** The stay under section 362 and the injunction under section 524(a) (2) shall not be violated by notification of the debtor and negotiation of cure under this subsection.

**(3)** In a case under chapter 11 in which the debtor is an individual and in a case under chapter 13, if the debtor is the lessee with respect to personal property and the lease is not assumed in the plan confirmed by the court, the lease is deemed rejected as of the conclusion of the hearing on confirmation. If the lease is rejected, the stay under section 362 and any stay under section 1301 is automatically terminated with respect to the property subject to the lease.

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2574; Pub.L. 98-353, Title III, §§ 362, 402-404, July 10, 1984, 98 Stat. 361, 367; Pub.L. 99-554, Title II, §§ 257(j), (m), 283(e), Oct. 27, 1986, 100 Stat. 3115, 3117; Pub.L. 100-506, § 1(b), Oct. 18, 1988, 102 Stat. 2538; Pub.L. 101-647, Title XXV, § 2522(c), Nov. 29, 1990, 104 Stat. 4866; Pub.L. 102-365, § 19(b)-(e), Sept. 3, 1992, 106 Stat. 982-984; Pub.L. 103-394, Title II, §§ 205(a), 219(a), (b), Title V, § 501(d)(10), Oct. 22, 1994, 108 Stat. 4122, 4128, 4145; Pub.L. 103-429, § 1, Oct. 31, 1994, 108 Stat. 4377; Pub.L. 109-8, Title III, §§ 309(b), 328(a), Title IV, § 404, Apr. 20, 2005, 119 Stat. 82, 100, 104.)

Notes of Decisions (2403)

Footnotes

1        So in original. The comma probably should not appear.

11 U.S.C.A. § 365, 11 USCA § 365

Current through P.L. 114-9 approved 4-7-2015

---

**End of Document**                                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
     Part I. Organization of Courts (Refs & Annos)
       Chapter 6. Bankruptcy Judges (Refs & Annos)

28 U.S.C.A. § 157

§ 157. Procedures

Currentness

**(a)** Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

**(b)(1)** Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

**(2)** Core proceedings include, but are not limited to--

   **(A)** matters concerning the administration of the estate;

   **(B)** allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

   **(C)** counterclaims by the estate against persons filing claims against the estate;

   **(D)** orders in respect to obtaining credit;

   **(E)** orders to turn over property of the estate;

   **(F)** proceedings to determine, avoid, or recover preferences;

   **(G)** motions to terminate, annul, or modify the automatic stay;

   **(H)** proceedings to determine, avoid, or recover fraudulent conveyances;

   **(I)** determinations as to the dischargeability of particular debts;

**(J)** objections to discharges;

**(K)** determinations of the validity, extent, or priority of liens;

**(L)** confirmations of plans;

**(M)** orders approving the use or lease of property, including the use of cash collateral;

**(N)** orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

**(O)** other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

**(P)** recognition of foreign proceedings and other matters under chapter 15 of title 11.

**(3)** The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

**(4)** Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2).

**(5)** The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

**(c)(1)** A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

**(2)** Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

**(d)** The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

**(e)** If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

**CREDIT(S)**

(Added Pub.L. 98-353, Title I, § 104(a), July 10, 1984, 98 Stat. 340; amended Pub.L. 99-554, Title I, §§ 143, 144(b), Oct. 27, 1986, 100 Stat. 3096; Pub.L. 103-394, Title I, § 112, Oct. 22, 1994, 108 Stat. 4117; Pub.L. 109-8, Title VIII, § 802(c)(1), Apr. 20, 2005, 119 Stat. 145.)

**VALIDITY**

<The United States Supreme Court has held that certain provisions of this section, as added by section 104(a) of Pub.L. 98-353 (28 U.S.C.A. § 157(b)(2)(C)), are unconstitutional as applied to certain core, noncore and related proceedings. Stern v. Marshall, U.S.2011, 131 S.Ct. 2594, 180 L.Ed.2d 475. >

Notes of Decisions (2005)

28 U.S.C.A. § 157, 28 USCA § 157
Current through P.L. 114-9 approved 4-7-2015

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1334

§ 1334. Bankruptcy cases and proceedings

Currentness

**(a)** Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

**(b)** Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

**(c)(1)** Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**(2)** Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

**(d)** Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. Subsection (c) and this subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

**(e)** The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction--

   **(1)** of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

   **(2)** over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.

**CREDIT(S)**

   (June 25, 1948, c. 646, 62 Stat. 931; Nov. 6, 1978, Pub.L. 95-598, Title II, § 238(a), 92 Stat. 2667; July 10, 1984, Pub.L. 98-353, Title I, § 101(a), 98 Stat. 333; Oct. 27, 1986, Pub.L. 99-554, Title I, § 144(e), 100 Stat. 3096; Dec. 1, 1990, Pub.L.

**RULE 201     REFERENCE TO BANKRUPTCY COURT**

Pursuant to 28 U.S.C. § 157(a), any and all cases arising under Title 11 United States Code and any and all proceedings arising under Title 11 or arising in or related to a case under Title 11 shall be referred to the judges of the bankruptcy court for the District of Massachusetts.

*Adopted effective January 2, 1995.*

## RULE 206     CORE PROCEEDINGS REQUIRING FINAL ADJUDICATION BY THE DISTRICT COURT

If a bankruptcy judge determines that entry of a final order or judgment by a bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under L.R. 201 and determined to be a core matter under 28 U.S.C. § 157, the bankruptcy judge shall hear the proceeding and submit proposed findings of fact and conclusions of law to the district court made in compliance with Fed. R. Civ. P. 52(a)(1) in the form of findings and conclusions stated on the record or in an opinion or memorandum of decision.

The district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with the federal and local rules of bankruptcy procedure. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.

The district court may treat any order or judgment of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution.

*Adopted June 5, 2012*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 11-16394-MSH |
| QUINCY MEDICAL CENTER, INC. | ) | through 11-16396 |
| QMC ED PHYSICIANS, INC. | ) | Jointly administered |
| QUINCY PHYSICIANS CORPORATION | ) |  |
|  | ) |  |
| Debtors | ) |  |

## MEMORANDUM OF DECISION ON MOTIONS OF APURV GUPTA AND VICTOR MUNGER FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIMS

Apurv Gupta and Victor Munger, senior executives of the debtor, Quincy Medical Center, Inc. ("QMC"), have filed substantively similar motions seeking allowance of administrative expense claims under § 503(b)(1) of the Bankruptcy Code, 11 U.S.C. § 101 et seq.,[1] for severance pay due them under QMC's Executive Severance Policy dated January 1, 2011. QMC opposes both motions.

The salient facts are not in dispute. Both Dr. Gupta and Mr. Munger were employees in good standing of QMC on July 1, 2011, the date QMC and certain affiliates filed voluntary petitions under chapter 11 of the Bankruptcy Code in this court. QMC's primary asset was Quincy Hospital, a 196 bed acute care facility which has served the community in and around Quincy, Massachusetts since 1890. Dr. Gupta served as Senior Vice President for Clinical Affairs/Chief Medical Officer of QMC pursuant to an employment agreement effective October 1, 2009. Mr. Munger served as Senior Vice President of Human Resources pursuant to a letter

---

[1] While the introductory paragraph of Mr. Munger's motion cites Bankruptcy Code § 503(b)(3), it is clear from the body of his motion and his prayer for relief that Mr. Munger seeks allowance of his claim under §503(b)(1).

agreement effective March 1, 2010. Both executives were included in QMC's executive severance policy as set forth in a memorandum dated January 1, 2011 which entitled them to, among other things, a minimum of six and a maximum of twelve months' base salary continuation upon termination of employment other than for cause. QMC's severance policy does not articulate specific guidelines or procedures for determining the circumstances under which an employee may receive in excess of the minimum six months' salary.

By letters dated October 7, 2011, QMC terminated Dr. Gupta's and Mr. Munger's employment without cause effective October 1, 2011 which was the date when substantially all the assets of QMC and its affiliates were acquired by a third party purchaser known as Quincy Medical Center a Steward Family Hospital, Inc. ("Steward"). Since that time Steward has been operating Quincy Hospital and its ancillary facilities. The cited reason for the terminations was Steward's failure to offer Dr. Gupta and Mr. Munger continued employment.

In the Asset Purchase Agreement ("APA") entered into by Steward and QMC and its affiliates, Steward agreed to offer employment for a period of no less than three months to each employee of QMC as of the date of the sale closing at the salary and position enjoyed by such employee prior thereto. Further, in the event Steward terminated any former QMC employee, Steward agreed to honor any severance obligation based on QMC's severance policy. While Dr. Gupta and Mr. Munger were QMC employees on the sale closing date, they were not offered employment by Steward.

Mr. Munger asserts a claim for administrative expenses against QMC in the amount of $135,000, consisting of a severance pay claim of $90,000, representing six months' salary, and a claim of $45,000, representing the minimum three months' salary he would have received had

Steward hired him.

Dr. Gupta asserts an administrative expense claim against QMC of $468,000, consisting of a severance claim of $312,000, equal to twelve months' salary, and a claim of $156,000, representing 180 days' salary, because QMC failed to give Dr. Gupta the requisite 180 days' prior notice of termination pursuant to his employment agreement.[2]

QMC is unwilling to concede that any component of either claim is entitled to administrative priority treatment. Furthermore, while QMC agrees with the amount of Mr. Munger's claim it suggests the claim is properly a claim against Steward. QMC submits that had Steward employed Mr. Munger as it was obligated to under the APA, Steward would have been obliged to retain and pay him for three months and then upon termination pay him six additional months' salary under QMC's severance policy.  As for Dr. Gupta's claim, without accepting any of Dr. Gupta's alternative claim amounts, QMC invites him as well to pursue Steward for recovery.

As noted previously, the claims of both executives consist of severance and non-severance components. In the case of Mr. Munger's claim, the non-severance component is $45,000 for three months' post sale compensation. There is no basis, however, for Mr. Munger's assertion that QMC should be liable for this amount. It was Steward, not QMC, who made the commitment to employ QMC's staff for a minimum of three months after the sale closing. Mr. Munger has failed to articulate any basis, nor am I aware of any, by which QMC should be held liable for Steward's failure to employ him.

---

[2] In his motion Dr. Gupta  offers a menu of possible lower administrative expense claims using a series of alternative calculation formulas but $468,000 is his high-side number and the only one in his prayer for relief.

3

Dr. Gupta's non-severance claim consists of 180 days' salary totaling $156,000 resulting from QMC's failure to give Dr. Gupta the required 180 day notice of termination under his employment agreement. But as Dr. Gupta's employment agreement was never assumed by QMC, his claim for termination damages is not a claim against QMC as debtor in possession, rather it is a textbook Bankruptcy Code § 502(b)(7) general unsecured claim. "Although during the Chapter 11 proceeding a prepetition executory contract remains in effect and enforceable against the nondebtor party to the contract, the contract is *unenforceable* against the debtor in possession unless and until the contract is assumed." *Mason v. Official Committee of Unsecured Creditors (In re FBI Distribution Corp.),* 330 F.3d 36, 43 (1st Cir. 2003).

Classifying the severance components of the two executives' claims is less clear cut than the non-severance components just discussed. Mr. Munger seeks six months' severance while Dr. Gupta seeks twelve. As observed previously, QMC's Executive Severance Policy is not clear as to the basis for a terminated employee's entitlement to severance pay in excess of six months. The only reasonable interpretation of the policy is that a terminated employee receives severance equal to six months unless otherwise mutually agreed. QMC's opposition to Dr. Gupta's motion indicates it did not agree to the doctor's receiving twelve months' severance and thus I conclude that the maximum severance to which Dr. Gupta is entitled is $156,000, representing six months of his salary at termination.

Having attended to the preliminaries, it is time to consider the pivotal issue presented by these motions—whether the severance claims are entitled to § 503(b)(1) priority status as expenses of administration of the chapter 11 case.

In the First Circuit, clear guidance has been provided by the court of appeals in decisions

arising out of the bankruptcies of two well-known discount retail chains from different eras,

Mammoth Mart and Filene's Basement. In *Cramer v. Mammoth Mart, Inc. (In re Mammoth*

*Mart, Inc.)*, 536 F.2d 950 (1st Cir. 1976), a Bankruptcy Act case, the court succinctly articulated

the principles for determining administrative expense qualification generally. These principles

remain as relevant today under Bankruptcy Code § 503(b)(1) as they were a generation ago

under § 64(a)(1) of the Bankruptcy Act. The court distinguished between transactions with a

debtor in possession and those with the pre-bankruptcy debtor:

> For a claim in its entirety to be entitled to first priority under s 64(a)(1), the debt must
> arise from a transaction with the debtor-in-possession. When the claim is based upon a
> contract between the debtor and the claimant, the case law teaches that a creditor's right
> to payment will be afforded first priority only to the extent that the consideration
> supporting the claimant's right to payment was both supplied to and beneficial to the
> debtor-in-possession in the operation of the business.

*Mammoth Mart*, 536 F.2d at 954.  Against this backdrop, the court laid out the test for

determining whether a severance pay claim is entitled to administrative priority treatment:

> It follows that whether a claim for severance pay based upon an unrejected contract with
> the debtor and arising from a chapter XI discharge will be entitled to s 64(a)(1) priority
> will depend upon the extent to which the consideration supporting the claim was
> supplied during the reorganization. If an employment contract provides that all discharged
> employees will receive severance pay equal to their salaries for a specified period, the
> consideration supporting the claim being an employee in good standing at the time of the
> discharge will have been supplied during the arrangement, and the former employee will
> be entitled to priority.

*Id. at 955.*

In an adversary proceeding brought by a former executive of Filene's Basement, the court

of appeals provided useful insight into its *Mammoth Mart* decision, refining it to achieve

consistency with the Bankruptcy Code. Again the court began by presenting a primer on how to

analyze administrative expense claims by parties to unassumed executory contracts such as the

employment agreements of Dr. Gupta and Mr. Munger.

> Where the debtor in possession, however, induces a nondebtor to render performance pursuant to an *unassumed* prepetition executory contract, pending its decision to reject or assume, the nondebtor party will be entitled to administrative priority only to the extent that the consideration supporting the claim was supplied to the debtor in possession during the reorganization and was beneficial to the estate.

*FBI* Distributing, 330 F.3d at 42-43. The court next turned to its *Mammoth Mart* decision

explaining that:

> The rationale underlying the holding was that because severance pay was a component of compensation for services rendered-that is, the employees' wages included severance pay-it could be entitled to administrative priority, but only to the extent that it was earned postpetition. Furthermore, it made no difference that the right to payment for the severance earned prepetition arose during the reorganization. What did matter was *when* the consideration supporting the claim was supplied. [*Mammoth Mart, 536 F.2dI].* at 954; *see also* 11 U.S.C. § 503(b)(1) ("for services rendered *after* the commencement of the case") (emphasis added).

*Id.* at 43.

Based on these two decisions, the law in the First Circuit is clear. Severance pay is

entitled to administrative expense priority only to the extent it is tied to the employee's length of

service so that it is part of the employee's compensation. If it passes that test then the

administrative expense priority is limited exclusively to that portion of severance pay attributable

to post petition services. As an example consider an employee whose compensation consists of

an annual salary of $100,000 plus severance equal to $100 per month for every month of

employment. If the employer were to become a chapter 11 debtor and later terminate the

employee, the employee would be entitled to an administrative expense claim for severance

equal to $100 for each month of service *after* the chapter 11 petition date.

Here, the severance pay arrangement for both Dr. Gupta and Mr. Munger had nothing to

do with length of service. Just like Ms. Mason's severance deal with Filene's Basement, whether

6

the QMC executives worked two minutes or two years after executing their employment agreements they were entitled to six months' salary upon termination without cause. The fact that Dr. Gupta and Mr. Munger stayed on with QMC and rendered valuable services post-petition does not change the result. They were fully compensated for their post-petition services.

The executives argue that QMC induced them to continue their employment post-petition by publicizing, generally and in pleadings filed in this court, the agreement of Steward to retain all QMC employees post-closing. Even if such conduct by QMC could be called inducement, the court of appeals in FBI dismissed inducement as a basis for creating an administrative expense claim because it amounted to the argument that the debtor in possession had assumed the employment agreement by implication. "It is well settled, however, that an executory contract cannot be assumed by the unilateral acts of the debtor in possession during the reorganization of its business." *Id.* 44. **"If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay *for the reasonable value of those services,* which, depending on the circumstances of a particular contract, may be what is specified in the contract." *Id.* at 43-44, citing *N.L.R.B. v. Bildesco and Bildesco*, 465 U.S. 513, 531, 104 S.Ct. 1188 (1984), and adding emphasis.

The severance pay claims of Dr. Gupta and Mr. Munger being unrelated to their salaries and length of service, the claims are not entitled to treatment as expenses of administration under Bankruptcy Code § 503(b)(1).

The matter, however, does not end here. The order of the court dated Sept 26, 2011 [Docket #339] approving the sale to Steward specifically approved the APA. Paragraph 30 of the

sale order provides:

> The terms and provisions of the APA, together with the terms and conditions of this Order, shall be binding in all respects upon all entities, including, without limitation, the Company (including its employees, officers and directors), its estates, all creditors and equity interest holders of the Company, Steward, and their respective affiliates, successors and assigns, agents and any affected third parties, including, but not limited to, all persons asserting a claim against or interest in any of the Assets to be sold, conveyed or assigned to Steward pursuant to the APA.

Under paragraph 37 of that order this court retains jurisdiction to "interpret [and] implement…" the APA and to "resolve any disputes arising under or related to the APA" Finally, paragraph 21 of the order dated November 22, 2011 confirming QMC and affiliates' joint plan of liquidation [#435] provides "the Sale Order shall survive Confirmation of the Plan, entry of this Order and the occurrence of the Effective Date."

A bankruptcy court has jurisdiction to interpret and enforce its own prior orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S.Ct. 2195, 2205 (2009); *First Marblehead Corp. v. Education Resources Institute, Inc*. 2011 WL 6141004, at *6 -7 (D. Mass. Dec. 8, 2011). By virtue of the sale order, which was not appealed, Dr. Gupta and Mr. Munger, employees of QMC on the date of that order, and Steward are bound by the order and the provisions of the APA. Both motions filed by the executives assert that Steward violated the terms of the APA by not offering them employment post-closing. I will, therefore, treat both motions as seeking relief in the alternative—either for an order granting administrative expense status to their claims or for an order directing Steward to pay them. Having denied their request for administrative expense status, I will set the motions down for further hearing on their request for an order directing Steward to pay the claims.

Separate Orders shall issue

Dated: February 13, 2012                                          By the Court,

                                                                 _____
                                                                 Melvin S. Hoffman
                                                                 U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 11-16394-MSH |
| QUINCY MEDICAL CENTER, INC. | ) | through 11-16396 |
| QMC ED PHYSICIANS, INC. | ) | Jointly administered |
| QUINCY PHYSICIANS CORPORATION | ) | |
| | ) | |
| Debtors | ) | |

### ORDER ON MOTION OF VICTOR MUNGER FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

In accordance with the Memorandum Of Decision On Motions Of Apurv Gupta And Victor Munger For Allowance Of Administrative Expense Claims issued today, it is hereby ORDERED that:

1. The Motion will be treated as seeking relief in the alternative- either payment of Mr. Munger's claim as an administrative expense or payment by Quincy Medical Center a Steward Family Hospital, Inc. ("Steward").

2. Mr. Munger's request for allowance of an administrative expense claim against the estate of Quincy Medical Center, Inc. is denied.

3. Steward shall have until **February 28, 2012 at 4:30 p.m.** to file its response to Mr. Munger's request for payment of his claim.

4. A non-evidentiary hearing on Mr. Munger's request for payment of his claim by Steward will be held on **WEDNESDAY, MARCH 14, 2012 AT 2:00 P.M.**

5. Mr. Munger shall serve notice of such hearing, along with a copy of this Order, on Steward and other parties in interest entitled to notice under the Federal Rules of

1

Bankruptcy Procedure and shall file a certificate of service with the Court.

Dated: February 13, 2012                          By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

2

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 11-16394-MSH |
| QUINCY MEDICAL CENTER, INC. | ) | through 11-16396 |
| QMC ED PHYSICIANS, INC. | ) | Jointly administered |
| QUINCY PHYSICIANS CORPORATION | ) | |
| | ) | |
| Debtors | ) | |

**ORDER ON MOTION OF APURV GUPTA FOR ALLOWANCE OF**
**ADMINISTRATIVE EXPENSE CLAIM**

In accordance with the Memorandum Of Decision On Motions Of Apurv Gupta And Victor Munger For Allowance Of Administrative Expense Claims issued today, it is hereby ORDERED that:

1. The Motion will be treated as seeking relief in the alternative- either payment of Dr. Gupta's claim as an administrative expense or payment by Quincy Medical Center a Steward Family Hospital, Inc. ("Steward").

2. Dr. Gupta's request for allowance of an administrative expense claim against the estate of Quincy Medical Center, Inc. is denied.

3. Steward shall have until **February 28, 2012 at 4:30 p.m.** to file its response to Dr.Gupta's request for payment of his claim.

4. A non-evidentiary hearing on Dr. Gupta's request for payment of his claim by Steward will be held on **WEDNESDAY, MARCH 14, 2012 AT 2 P.M.**

5. Dr. Gupta shall serve notice of such hearing, along with a copy of this Order, on Steward and other parties in interest entitled to notice under the Federal Rules of

1

Bankruptcy Procedure and shall file a certificate of service with the Court.


Dated: February 13, 2012                              By the Court,


Melvin S. Hoffman
U.S. Bankruptcy Judge


2

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 11-16394-MSH |
| QUINCY MEDICAL CENTER, INC. | through 11-16396 |
| QMC ED PHYSICIANS, INC. | Jointly administered |
| QUINCY PHYSICIANS CORPORATION |  |
| Debtors. |  |

## MEMORANDUM OF DECISION ON MOTIONS OF APURV GUPTA AND VICTOR MUNGER FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIMS

Apurv Gupta and Victor Munger, senior executives of the debtor, Quincy Medical Center, Inc. ("QMC"), filed substantively similar motions seeking allowance of administrative expense claims under Bankruptcy Code §503(b)(1), 11 U.S.C. § 503(B)(1), for severance pay due them under QMC's Executive Severance Policy dated January 1, 2011. After an initial hearing, I denied the executives' motions as to QMC but determined that the motions also sought relief in the alternative against Quincy Medical Center, a Steward Family Hospital, Inc. ("Steward"), which purchased substantially all of QMC's assets. *In re Quincy Medical Center, Inc.*, 466 B.R. 26, 32 (Bankr. D. Mass. 2012) ("*QMC I*"). After giving Steward time to respond to the motions, I conducted a second non-evidentiary hearing at the conclusion of which I solicited additional memoranda and affidavits from the parties and ordered QMC to file an affidavit regarding certain schedules to the asset purchase agreement between QMC and Steward referred to during the hearing. Upon receipt and review of the additional materials I took the matter under advisement. For the reasons set forth below I will grant Dr. Gupta's and Mr. Munger's motions as to Steward.

**Facts**

*QMC I* contains a thorough recitation of the background and facts concerning the relationship among QMC, Steward and the executives. Only those facts which are relevant to the issues presently before me are reprised here.

Dr. Gupta served as Senior Vice President for Clinical Affairs/Chief Medical Officer of QMC pursuant to an employment agreement effective October 1, 2009. Mr. Munger served as QMC's Senior Vice President of Human Resources pursuant to a letter agreement effective March 1, 2010. Both executives were included in QMC's executive severance policy as set forth in a memorandum dated January 1, 2011. The policy entitled them to, among other things, a minimum of six and a maximum of twelve months' base salary continuation upon termination of employment other than for cause.

On June 30, 2011, QMC and its affiliates signed an Asset Purchase Agreement (the "APA") whereby they agreed to sell substantially all of their assets to Steward. The APA provides that it is governed by Massachusetts law. On July 1, 2011, QMC and certain affiliates commenced this case by filing voluntary petitions under chapter 11 of the Bankruptcy Code. A motion to sell the debtors' assets to Steward was filed the same day and the motion was subsequently allowed by order dated September 26, 2011. The order approving the sale made the APA as well as the order itself binding on Steward and QMC, including QMC's employees, officers and directors. The sale was consummated on October 1, 2011.

Among the assets not purchased by Steward and for which the APA states Steward assumed no liability are those assets defined in the APA as "Excluded Assets." The Excluded Assets include contracts identified on schedule 2.2(b) to the APA. Schedule 2.2(b) was not

attached to the copy of the APA filed with the court.[1] Steward, however, provided an unverified

and undated copy of schedule 2.2(b) in connection with its objection to the Munger and Gupta

motions. No party has asserted that the copy of schedule 2.2(b) submitted by Steward is not what

it purports to be. That schedule includes a section entitled "Excluded Medical Staff

Agreements."  Listed as item 18 in that section is the "Employment Agreement between Quincy

Medical Center and Dr. Apurv Gupta to serve as Quincy's Senior Vice President for Medical

Affairs/Chief Medical Officer, effective October 1, 2009."  Mr. Munger's employment contract,

which the parties refer to as a "letter agreement," does not appear anywhere on schedule 2.2(b).

Section 9.1 of the APA provides:

> Not later than ten (10) Business Days prior to the Closing, Purchaser shall offer
> employment by Purchaser to each of the Employees who remain employed by Seller as of
> a recent date, as specified by Seller to Purchaser at least three Business Days in advance
> of Purchaser commencing delivery of such offers of employment, such employment to
> commence immediately following the Closing. Seller shall deliver to Purchaser with such
> listing of Employees as of such date a reconciliation of such list with the list of
> Employees delivered to Purchaser pursuant to Section 5.14 [that is, a document
> reconciling the list of Employees with those who gave notice of their intention *not* to
> become employed by Steward]. Purchaser shall likewise deliver as soon as practicable
> such an offer to any individual not included on the list but who is an Employee as of the
> Closing Date. Each such offer of employment shall be at the same salary or hourly wage
> rate and position in effect immediately prior to the Closing.  Such individuals who accept
> such offer of employment are hereinafter referred to as the "Transferred Employees."

As required by section 9.1 of the APA, at least three business days before Steward was to

---

[1] It is unclear whether schedule 2.2(b) existed when the APA was signed.  Section 1.3(a)(iv)
provides:

> [w]ith respect to all other Schedules …, including without limitation the classification of
> executory contracts as Purchased Contracts, Excluded Contracts or Transitional
> Contracts, such Schedules (including any amendments to the original Schedules) shall be
> subject to the mutual agreement of the parties as embodied in (i) such Schedules as exist
> and are appended to this Agreement as of the date hereof and (ii) such Schedules as are
> subsequently included and incorporated into this Agreement.

make offers of employment to the QMC employees, QMC was to provide Steward with a list of

its employees reconciled to remove the names of any employee who chose not to become

employed by Steward. According to the Declaration of Robert E. Annas, a managing director of

Navigant Capital Advisors, LLC ("Navigant"), which had been employed by QMC to assist in

the sale transaction (the "Annas Affidavit"), Navigant maintained an electronic data room

containing "due diligence" information relevant to QMC and available for review by qualified

potential purchasers, including Steward.  According to the Annas Affidavit the names of both Dr.

Gupta and Mr. Munger appear consistently on QMC employee lists which were posted to the

electronic data room on the March 28, 2011, September 13, 2011 and September 15, 2011.

Section 9.2(a) of the APA provides:

> Purchaser shall provide, or cause to be provided, for a period ending not earlier than the
> end of the third month following the Closing Date or such longer period of time required
> by applicable Law, to each of the Transferred Employees, base wage and salary levels
> provided to such Employees immediately prior to the Closing.  Purchaser shall provide
> each Transferred Employee with employee benefits consistent with similarly-situated
> employees of Purchaser (provided that nothing in this Section 9.2 shall require Purchaser
> to pay severance to any Transferred Employee).

Under section 5.14(c) of the APA Steward was responsible for the severance pay or other

payments to any individual employed by QMC as of the closing date in the event that Steward

terminated the employment of such employee at or following the closing date. That section

provides:

> Except as set forth in Section 5.14(c) of the Seller Disclosure Schedule [that is, a
> document reconciling the list of Employees with any who gave notice of their intention
> not to become employed by Steward] no Employee has given as of the date hereof notice
> of intention to leave Seller's employ before or after the Closing, and upon Purchaser's
> termination of the employment or engagement of any employees or consultants of Seller
> at or following the Closing, Purchaser shall be liable to any such persons for severance or
> retention pay or any other payments otherwise due them as employees of or consultants
> for Seller (including accrued salary or vacation in accordance with normal policies).

Both Dr. Gupta and Mr. Munger were QMC employees in good standing on October 1, 2011, the date of the closing. Neither was offered employment by Steward.[2]

QMC sent each of Dr. Gupta and Mr. Munger letters dated October 7, 2011 stating that each was terminated effective October 1, 2011. Each letter gave the same reason for the termination, namely, that QMC, having sold its assets to Steward, was no longer operating a hospital and no longer had a need for the services each provided.  The letters also noted that under the APA Steward was to offer employment to all employees of QMC.

Mr. Munger asserts a claim against Steward in the amount of $135,000, consisting of a severance pay claim of $90,000, representing six months' salary, and a claim of $45,000, representing the minimum three months' salary he would have received had Steward hired and then fired him.

In a supplemental pleading [# 609] filed after his representation in court that he would do so, Dr. Gupta amended his original claim to seek from Steward $234,000, consisting of a severance claim of $156,000, equal to six months' salary, and a claim of $78,000, representing three months' salary.[3]

### Positions of the Parties

Dr. Gupta, Mr. Munger and QMC argue that the APA is clear: Steward was required to offer employment to those individuals who were employed by QMC on an agreed upon date at or

---

[2] The inclusion of Dr. Gupta's employment contract among the Excluded Assets does not alter the fact that on the closing date he was an employee of QMC.

[3] The amended claim is half of what Dr. Gupta initially requested. His amended claim is brought under the APA, not under his employment contract which was excluded from the assets purchased by Steward.

5

near the closing and who were on the list of employees QMC provided to Steward prior to the

closing. According to QMC and the claimants, because Dr. Gupta and Mr. Munger met both

criteria, Steward had no choice but to offer them employment. Its failure to do so constituted a

breach of the APA and resulted in claims by the executives that must be borne by Steward.  In

other words, the claimants and QMC assert that as a consequence of Steward's breach of the

APA, both Dr. Gupta and Mr. Munger should be treated as if they had been employed by

Steward as of the closing and then had their employment immediately terminated. Therefore,

they maintain that Steward owes each terminated claimant three months' salary[4] plus six months'

severance pay[5] as provided for in the APA.

      Steward raises several points in response.  First, it argues that Dr. Gupta and Mr. Munger

lack standing to assert their claims because they are not parties to the APA and the APA

expressly disclaims third party beneficiary rights. Thus, Steward asserts, it has no obligation to

Dr. Gupta or Mr. Munger directly. In a related argument Steward asserts that if it did breach the

APA only QMC may seek damages and QMC's exclusive remedy under the APA is

indemnification. Steward alleges that QMC's indemnification claim is time-barred under the

APA and, in any event, lacking in merit because my ruling in *QMC I* denied Dr. Gupta's and Mr.

Munger's administrative expense claims against QMC.  Furthermore, maintains Steward, even if

it were required to indemnify QMC to the extent Dr. Gupta's and Mr. Munger's claims were

treated as general unsecured claims in the bankruptcy case, it would only have to reimburse

---

[4] Under section 9.2 of the APA, Steward agreed to employ all Transferred Employees for at least
three months.

[5] Under section 5.14(c) of the APA, Steward agreed that if it terminated any QMC employee
after the closing it would be liable to that employee for severance pay due that employee under
QMC's severance policy.

QMC for the amounts actually paid on those claims, which Steward estimates would be seven cents on the dollar.

Steward further maintains that compelling Steward to pay QMC's former executives' claims is in the nature of specific performance, which is a disfavored remedy in the context of personal service contracts. Steward reasons that because it did not offer employment to Dr. Gupta or Mr. Munger, neither falls within the definition of a Transferred Employee under the APA and consequently Steward cannot be liable for their pay or severance claims. Steward also alleges that prior to the closing it notified QMC orally that it had no intention of employing Dr. Gupta or Mr. Munger and insisted that QMC terminate them before the closing. During the second hearing in this matter, Steward's attorney represented that QMC orally informed Steward that Dr. Gupta's and Mr. Munger's employment would be terminated prior to the closing.[6] Finally, Steward asserts that Dr. Gupta's contract was among those listed in the APA schedule 2.2(b) as excluded from the sale and thus Steward has no liability to Dr. Gupta.

QMC and the claimant executives retort that section 5.14(c) of the APA renders Steward directly liable to the executives. They note that the September 26th order authorizing the sale by QMC to Steward expressly binds, among others, QMC's employees. Therefore they conclude that Dr. Gupta and Mr. Munger can proceed directly against Steward. Moreover, to the extent a standing problem exists, the executives assert that it is easily cured by QMC's assigning to them its rights under the APA. They rebut the notion that requiring Steward to pay their claims is in the nature of specific performance by pointing out that Steward is not being compelled to employ Dr. Gupta and Mr. Munger for any period of time but merely to treat them as if they had been

---

[6] Steward has not proffered any affidavit or other evidence as to these allegations.

employed for an instant after the closing. They observe, moreover, that section 11.10 of the APA provides that in the event of a breach of the APA, the non-breaching party is entitled to specific performance which the parties expressly agreed not to oppose specific performance on the grounds that money damages may provide an adequate remedy. Finally, the executives and QMC argue that the APA could not be amended orally and thus any discussions between Steward and QMC concerning the pre-closing termination of Dr.Gupta's and Mr. Munger's employment are irrelevant and unenforceable.

Regarding QMC's argument that it could assign its rights under the APA to the claimants, Steward responds that section 13.8 of the APA prohibits QMC from assigning any claims under the APA without Steward's express written consent, which of course Steward has not given.

## Authority of Bankruptcy Court

As discussed in *QMC I,* jurisdiction of the bankruptcy court to hear and rule upon disputes arising from the sale by QMC to Steward is expressly reserved in the September 26, 2011 order approving the sale. *Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009); *First Marblehead Corp. v. Education Resources Institute, Inc.* 2011 WL 6141004, at *6–7 (D.Mass. Dec. 8, 2011). *See also In re The Education Resources Institute, Inc.*, 442 B.R. 20, 24-25 (Bankr. D. Mass. 2010).

## Discussion

### The APA and Specific Performance

Steward argues that the time-honored reluctance of courts to impose the remedy of

specific performance in situations involving personal service contracts justifies barring Dr. Gupta

and Mr. Munger from obtaining such a remedy from Steward. Steward's position is overly

simplistic. Although courts have been hesitant to order specific performance, the usual

circumstance in which such unwillingness arises is when the party alleged to have breached the

contract would otherwise be ordered to render services to the non-breaching party. *Redgrave v.*

*Boston Symphony Orchestra, Inc.*, 557 F. Supp. 230, 235 (D. Mass. 1983). Here if Steward did

indeed breach the APA, its liability will be confined to the payment of money. The fact that the

process of calculating monetary damages involves assuming that Steward has employed both Dr.

Gupta and Mr. Munger for an instant after the closing, at which point they were deemed

terminated, involves none of the pragmatic problems arising in situations where services must

actually be provided if specific performance were to be ordered. Nothing in the APA requires

Steward to be burdened with actually employing Dr. Gupta or Mr. Munger for any length of

time.  Moreover, the parties' waiver of any objection to specific performance as set forth in

section 11.10 of the APA undercuts Steward's argument on this point.

**The APA and Third Party Beneficiaries**

Whether a contract confers rights of enforcement on non- parties depends upon the intent

of the parties to the contract.  The intent to confer third party beneficiary status is found where

"the circumstances indicate that the promisee intends to give the beneficiary the benefit of the

promised performance." *Rae,* 386 Mass. at 194, 435 N.E.2d 628, quoting Restatement (Second)

of Contracts § 302(1)(b) (1981). On the other hand, the mere fact "[t]hat the plaintiffs derive a

benefit from a contract between others does not make them intended third-party beneficiaries and

does not give them the right to enforce that agreement." *Cumis Ins. Society, Inc. v. BJ's*

9

*Wholesale Club, Inc.*, 455 Mass. 458, 464, 918 N.E.2d 36, 42 (Mass. 2009). Moreover, where the parties have expressly and unambiguously stated an intention to exclude third party beneficiaries, that intent is controlling. *See Volpe Constr. Co. v. First Nat'l Bank,* 30 Mass. App. Ct. 249, 256–257, 567 N.E.2d 1244 (1991), quoting 4 Corbin, Contracts § 777, at 25 (1951) ("it is plain that, 'if two contracting parties expressly provide that some third party who will be benefited by performance shall have no legally enforceable right, the courts should effectuate the expressed intent by denying the party any direct remedy'"). *Cumins,* 455 Mass. at 464, 918 N.Ed.2d at 42-43.

In this case section 13.8 of the APA contains a standard no-third-party-beneficiaries clause. The claimants urge, however, that section 5.14(c) of the APA manifests a specific intent of the parties to grant QMC employees third party beneficiary status and this section trumps the more general language in section 13.8. Indeed, when interpreting a contract containing two seemingly contradictory clauses, it is a basic tenet of contract interpretation that the more specific clause prevails over the general one. *Lawson v. F.D.I.C.*, 3 F.3d 11, 17 (1st Cir. 1993); *Lembo v. Waters,* 1 Mass. App. Ct. 227, 233 (1973). Moreover, "a contract is to be construed to give a reasonable effect to each of its provisions if possible … [and] … should be construed so as to give it effect as a rational business instrument and in a manner which will carry out the intention of the parties." *McMahon v. Monarch Life Ins. Co.,* 345 Mass. 261, 264, 186 N.E.2d 827, 830 (1962). Courts must "construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished." *Brynes v. Gloucester,* 297 Mass. 156, 158 (1937).

The parties have not cited, nor have I found, any cases applying Massachusetts law in

**Page 43**

situations where a contract contains a boilerplate no-third-party-beneficiaries clause and also a more specific clause evidencing the contracting parties' intent to confer such rights on specific beneficiaries. Outside of Massachusetts a few courts have found contracts to create rights in third party beneficiaries despite express language in the contract to the contrary. *See, e.g., Versico v. Engineered Fabrics Corp.*, 238 Ga. App. 837, 841, 520 S.Ed.2d 505, 508-099 1999) (finding direct cause of action by assignee of building against buyer of roofing contractor's business even though purchase agreement between buyer and its seller stated there were to be no third party beneficiaries of the contract which also called for the buyer to take over the seller's warranty obligations).

In *Lapping v. HM Health Services, Inc.*, 2005 WL 407588 (Ohio App. 11 Dist. Feb. 18, 2005), a case with some factual similarities to the one here, the appeals court affirmed the trial court's holding that a physician was an intended third party beneficiary of an agreement between his employer, Warren General Hospital (the "Hospital"), and HM Health Services ("HM") involving HM's purchase of the assets of the Hospital.  The court found that the Hospital and HM, acknowledging that their medical staffs would need to be combined, included the following provision in the purchase agreement:

> [HM] represents and warrants that those physicians with medical staff privileges at Warren General Hospital who have applied for privileges at St. Joseph Health Center have received the same clinical privileges that they held at Warren General Hospital prior to the closing.

Dr. Lapping applied for privileges at St. Joseph's and when they were refused, sued HM for breach of contract. HM, denied that it was liable, relying on the purchase agreement which stated that "[e]xcept as otherwise expressly provided herein," there were no third party beneficiaries to the agreement. The court found that HM's representation and warranty that physicians who

11

applied for staff privileges at St. Joseph's would receive them demonstrated an intention to create third party rights in Dr. Lapping as a member of the class of physicians who applied for hospital privileges. The court found that HM's representation and warranties carved physicians' rights to staff privileges out of the general exclusion of third party beneficiary rights. The court noted that the phrase "[e]xcept as otherwise expressly provided herein" introducing the no-third-party-beneficiary clause was consistent with its interpretation.

In the case before me, while the boilerplate no-third-party-beneficiary clause in section 13.8 of the APA lacks the introductory phrase "except as otherwise provided herein" found in the contract in *Lapping*, there exists the same apparent conflict between the general anti-third party beneficiary clause and the more specific contract provision reflecting an intent to benefit a defined class. The intent of the specific contract provision here is even more imperative than the one in *Lapping* which dealt with representations and warranties. Section 5.14(c) of the APA states that Steward "*shall be liable* to any [QMC employee] terminated at or following the closing." (Emphasis added). I note also that while section 9.2(a) of the APA states that "[Steward] shall provide each Transferred Employee with employee benefits consistent with similarly-situated employees of [Steward] (*provided nothing in this Section 9.2 shall require [Steward] to pay severance pay to any Transferred employee)* (emphasis added), section 9.2(a) is not the source of the executives' claims.  Their claims to the right to severance pay arise from *QMC's* (not Steward's) executive severance policies, which section 5.14(c) of the APA mandates be honored by Steward.

I predict that were the Massachusetts Supreme Judicial Court to rule on this issue, it would conclude that section 5.14(c) of the APA manifests an explicit intent to benefit a class of

non-party beneficiaries to the APA, namely QMC's employees on the closing date,[7] and that this intent trumps the boilerplate no-third-party-beneficiary clause of section 13.8. Dr. Gupta and Mr. Munger are Transferred Employees within the meaning of the APA and as such they became employees of Steward on October 1, 2011 when the sale closed. Steward's refusal to treat them as employees was a de facto termination of their employment and under section 5.14(c) of the APA Steward is liable to the executives "for severance or retention pay or any other payments otherwise due them as employees of or consultants for [QMC]."

Steward is, therefore, liable to each of Dr. Gupta and Mr. Munger for severance pay equal to six months' compensation under QMC's executive severance policy; $156,000 for Dr. Gupta and $90,000 for Mr. Munger.

Furthermore, under section 5.14(c) of the APA Steward is liable to the executives for "any other payments otherwise due them as employees [of QMC]." Section 9.2(a)of the APA requires that Steward "provide, or cause to be provided, for a period ending not earlier than the third month following the Closing Date …, to each of the Transferred Employees, base wage and salary levels provided to such Employees immediately prior to the Closing," in other words the same wages and salaries provided them by QMC. Since Dr. Gupta and Mr. Munger are Transferred Employees, they are entitled to these "other payments," namely the three months of salary called for by section 9.2(a) of the APA. Therefore, I find the executives are entitled to three months' salary; $78,000 for Dr. Gupta and $45,000 for Mr. Munger.

---

[7] The fact that there may have been discussions between QMC and Steward about excluding Dr. Gupta and Mr. Munger from the class of beneficiaries is not relevant to the issue of whether the parties intended to benefit the class generally. The language of section 5.14(c) compels the conclusion that the parties intended to benefit the class of Transferred Employees. Their subsidiary intent as to who should have been included in that class does not bear on the third party beneficiary question.

## Conclusion

Because the intent of the parties was to make Transferred Employees third party

beneficiaries under section 5.14(c) of the APA, the motions of Dr. Gupta and Mr. Munger

seeking allowance of claims against Steward are allowed in the amounts set forth above.

Separate orders will issue.


Dated: September 25, 2012                                    By the Court,



                                                            _Melvin S. Hoffman_

                                                            _____
                                                            Melvin S. Hoffman
                                                            U.S. Bankruptcy Judge


Counsel of Record

John Morrier
Casner & Edwards, LLP
Boston, MA
Counsel to Quincy Medical Center, Inc.

Charles Bennett
Murphy & King, P.C.
Boston, MA
Counsel to Victor Munger

Bruce Gladstone
Cameron & Mittleman LLP
Providence, RI
Counsel to Apurv Gupta

James D. McGinley
Edwards Wildman Palmer LLP
Boston, MA
Counsel to Quincy Medical Center, a Steward Family Hospital, Inc.

**Page 47**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 11-16394-MSH |
| QUINCY MEDICAL CENTER, INC. | ) | through 11-16396 |
| QMC ED PHYSICIANS, INC. | ) | Jointly administered |
| QUINCY PHYSICIANS CORPORATION | ) | |
| | ) | |
| Debtors. | ) | |

### ORDER ON MOTION OF VICTOR MUNGER FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

For the reasons set forth in the Memorandum of Decision on the Motions of Apurv Gupta and Victor Munger for Allowance of Administrative Expense Claims issued today, the motion of Victor Munger is ALLOWED as against Quincy Medical Center, a Steward Family Hospital, Inc. in the amount of $135,000.

Dated: September 25, 2012

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

**Page 48**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | Case No. 11-16394-MSII |
| QUINCY MEDICAL CENTER, INC. ) | through 11-16396 |
| QMC ED PHYSICIANS, INC. ) | Jointly administered |
| QUINCY PHYSICIANS CORPORATION ) | |
| ) | |
| Debtors. | |

### ORDER ON MOTION OF APURV GUPTA FOR ALLOWANCE OF
### ADMINISTRATIVE EXPENSE CLAIM

For the reasons set forth in the Memorandum of Decision on the Motions of Apurv Gupta

and Victor Munger for Allowance of Administrative Expense Claims issued today, the motion of

Apurv Gupta is ALLOWED as against Quincy Medical Center, a Steward Family Hospital, Inc.

in the amount of $234,000.

Dated: September 25, 2012

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

**Page 49**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NOS.12-40128-RWZ and 12-40131-RWZ


QUINCY MEDICAL CENTER,
A STEWARD FAMILY HOSPITAL, INC.

v.

APURV GUPTA, M.D.,
and VICTOR MUNGER


MEMORANDUM OF DECISION

January 5, 2015


ZOBEL, D.J.

This appeal arises out of the bankruptcy of Quincy Medical Center, Inc., QMC

ED Physicians, Inc., and Quincy Physician Corporation ("Debtors"). Quincy Medical

Center, a Steward Family Hospital, Inc. ("Steward")—which is a separate legal entity

from the Debtors—appeals the bankruptcy court's post-confirmation judgments allowing

two other non-debtors' claims against it. Because the bankruptcy court lacked subject

matter jurisdiction to enter those judgments, they are VACATED and the case is

remanded with instructions to dismiss Munger's and Gupta's claims against Steward.

I.      **Background**[1]

---

[1] The facts are taken from the bankruptcy court's opinions below. See Memorandum of Decision
on Motions of Apurv Gupta and Victor Munger for Allowance of Administrative Expense Claims (Feb. 13,
2012) (Docket # 5-10) ("QMC I"); Motions of Apurv Gupta and Victor Munger for Allowance of
Administrative Expense Claims (Sept. 25, 2012) (Docket # 5-24) ("QMC II").

Appellees, Victor Munger and Apurv Gupta, were executives at Quincy Medical Center, a hospital in Quincy, Massachusetts.  QMC I at 1.  For most of the time they worked there,[2]        the hospital was operated by Quincy Medical Center, Inc., QMC ED Physicians, Inc., and Quincy Physicians Corp., which were the Debtors in the bankruptcy case underlying this appeal.  Id. at 2.

On July 1, 2011, Debtors filed for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts.  See id. at 1.  That same day, Debtors filed a motion (the "Sale Motion") asking the bankruptcy court to approve, among other things, an asset purchase agreement ("APA") with Steward.  Docket # 5.  The APA effectuated the sale of substantially all of Debtors' operating assets to Steward.  QMC I at 2.

The APA included provisions about the continued employment of Debtors' employees.  Section 9.1 of the APA provides that "[n]ot later than ten (10) Business Days prior to the Closing, Purchaser shall offer employment by Purchaser to each of the Employees who remain employed by Seller as of a recent date, . . . such employment to commence immediately following the Closing."  Docket # 5 at 99.  Section 9.2 then purports to require the Purchaser to pay each such employee "base wage and salary levels provided to such Employees immediately prior to the Closing" for three months after the Closing, id., and Section 5.14 says that "upon Purchaser's termination of the employment or engagement of any employees or consultants of

---

[2] According to appellees, Munger served as Senior Vice President of Human Resources pursuant to a letter agreement effective March 1, 2010, and Gupta served as Senior Vice President for Clinical Affairs/Chief Medical Officer pursuant to an employment agreement effective March 1, 2010.  See Appellee Br. at 3-4 (Docket # 19).

Seller at or following the Closing, Purchaser shall be liable to any such persons for severance or retention pay." Id. at 75.  The APA also includes several provisions governing its construction, including one that purports to require that amendments or modifications be in writing and one that disavows any third-party beneficiaries.  APA § 13.4, id. at 110-11 (amendment or modification); APA § 13.8, id. at 112 (no third-party beneficiaries).

On September 26, 2012, the bankruptcy court issued an order approving the Sale Motion, Docket # 5-2 (the "Sale Order"), and the sale closed on October 1, 2011. QMC II at 2.  On October 7, 2011, Debtors filed a proposed Chapter 11 plan of reorganization (the "Plan").  Docket # 20-2.  The bankruptcy court confirmed the Plan in an order signed on November 22, 2011 (the "Confirmation Order").  Docket # 20-1. Both the Sale Order and the Plan contain provisions that purport to retain jurisdiction in the bankruptcy court over disputes arising under them.  The Sale Order provides that:

> T. It is necessary and appropriate, in order to ensure the validity of the sale of the assets to Steward and to ensure compliance with the Order, for this Court to retain jurisdiction to: (a) interpret and enforce the provisions of the APA, the Assigned Agreements, the Sale Motion and this Order; ... (c) resolve any disputes arising under or relating to the APA, the Assigned Agreements, the Sale Motion, and this Order; . . . .

> 37. This Court retains jurisdiction to: (a) Interpret, implement and enforce the terms and provisions of this Order, the APA, the Assigned Agreements; . . . ( c) Resolve any disputes arising under or relating to the APA, the Assigned Agreements, the Sale Motion, or this Order; . . . .

Docket # 5-2 at 15, 29.  Similarly, the Plan says that:

> Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall, to the maximum extent permitted by applicable law, retain

3

**Page 52**

exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to: . . .

15. Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code; . . . .

29. Enforce all orders previously entered by the Bankruptcy Court; . . . .

Docket # 20-2 at 39-41.  The Confirmation Order incorporates the retention of jurisdiction provisions from the Plan.  See Docket # 20-1 at 18.

Debtor Quincy Medical Center, Inc., sent Munger and Gupta a letter terminating their employment shortly after the sale.[3]  QMC II at 5.  Believing this to have been wrongful, Munger and Gupta sought severance pay by filing motions for allowance of administrative expense claims in the bankruptcy court.[4]  Docket # 5-3 and 5-5.  On February 13, 2012, the bankruptcy court declined to treat Munger's and Gupta's claims as administrative expenses.  Docket # 5-10.  Yet, it did not wholly deny their motions—the bankruptcy court instead treated them as "seeking relief in the alternative . . . payment by [Steward]."  Docket # 5-11 at 1; Docket # 5-12 at 1.  After offering Steward an opportunity to respond and holding a non-evidentiary hearing, the bankruptcy court issued orders directing Steward to pay Munger's and Gupta's claims.  Docket ## 1036 and 1037.

---

[3] There is a dispute between Debtors, Steward, and Gupta and Munger about the effective date of the termination and about which corporate entity terminated them.  Because I do not need to resolve that dispute to resolve this appeal, I make no findings or conclusions about the circumstances of the terminations.

[4] Munger sought $135,000 in a motion filed November 2, 2011.  Docket # 5-3.  Gupta first sought $468,000 in his motion filed on November 17, 2011, but he amended his claim to seek only $234,000 on April 6, 2012.  Docket # 5-5 (Nov. 17, 2011 motion); Docket # 5-20 (Apr. 6, 2012 motion).

4

Steward timely appealed both orders, and I consolidated the appeals.  Docket # 24.  Steward primarily contends that the bankruptcy court lacked subject matter jurisdiction to decide Munger's and Gupta's claims against it and to enter the orders.  It also contends that the bankruptcy court failed to hold a sufficient hearing on the motions, erred in finding that Munger and Gupta had standing to assert a breach of the APA because of a no-third-party-beneficiaries clause, and improperly interpreted the APA's sections on employment obligations.  This court has jurisdiction to hear these appeals under 28 U.S.C. § 158(a)(1).

## II.    Legal Standard

"It is hornbook law that a court cannot act in the absence of subject matter jurisdiction; and that, when such jurisdiction is lacking, a court is obliged to note the defect on its own initiative."  United States v. Horn, 29 F.3d 754, 767 (1st Cir. 1994).  My review of the jurisdictional question, like all of the bankruptcy court's legal conclusions, is de novo.  Parker v. Handy (In re Handy), 624 F.3d 19, 21 (1st Cir. 2010).

## III.   Analysis

Bankruptcy courts are vested with "limited authority."  See, e.g., Bd. of Governors v. MCorp Fin., Inc., 502 U.S. 32, 40 (1991).  "The general grant of bankruptcy jurisdiction is contained in 28 U.S.C. § 1334."  In re Boston Regional Med. Ctr., Inc., 410 F.3d 100, 105 (1st Cir. 2005).  Section 1334 vests original jurisdiction in the district courts over "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  By standing order, this District

5

has granted the bankruptcy court jurisdiction over all cases in which jurisdiction is premised on § 1334, subject to appellate review by the district court. See D. Mass. L.R. 201 (delegating jurisdiction to bankruptcy court); 28 U.S.C. § 157 (authorizing delegation of jurisdiction to bankruptcy court); id. § 158 (authorizing review of bankruptcy court orders by district court).

Section 1334 grants district courts (and, by delegation, bankruptcy courts) jurisdiction over four types of matters: "(1) cases under title 11, (2) proceeding arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11." Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 162 (3d Cir. 2004). Proceedings falling into the first three categories are called "core" proceedings, while those falling into the last category are "non-core" proceedings. Stern v. Marshall, 131 S. Ct. 2594, 2605 (2011). Steward contends that the proceedings under review here are "non-core" proceedings, Appellant Br. at 11, which Munger and Gupta do not appear to dispute.[5]

The key question in this appeal therefore is whether Munger's and Gupta's claims against Steward are "related to" the Debtors' bankruptcy proceeding. "The statutory grant of 'related to' jurisdiction is quite broad," extending to "the entire universe of matters connected with bankruptcy estates." In re Boston Regional Med.

---

[5] Despite being empowered to do so under 28 U.S.C. § 157, the bankruptcy court did not determine whether the disputes on appeal were core proceedings. Because the parties appear to agree that they are not and because other courts have so held in similar contexts, I will assume that these are non-core proceedings. See, e.g., In re Mortg. Lenders Network, USA, Inc., No. 07-10146, 2011 WL 4543257, at *3-4 (Bankr. D. Del. Sept. 28, 2011) (concluding that plaintiffs' claims for unpaid wages were non-core because they did not fall into any of the categories of core proceedings in 28 U.S.C. § 157(b) and did not arise in a bankruptcy case or under the Bankruptcy Code).

Ctr., Inc., 410 F.3d at 105.  Yet, "related to" jurisdiction is not without limit.
"[B]ankruptcy courts ordinarily may exercise related to jurisdiction as long as the
outcome of the litigation 'potentially [could] have some effect on the bankruptcy estate,
such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise
have an impact upon the handling and administration of the bankrupt estate.'"  Id.
(quoting In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991)) (emphasis added).
The critical limitation on "related to" jurisdiction is that "bankruptcy courts have no
jurisdiction over proceedings that have no effect on the estate of the debtor."  Celotex
Corp. v. Edwards, 514 U.S. 300, 308 n.6 (1995).

       Timing also affects the relationship between a third-party proceeding and
a bankruptcy estate.  After confirmation of the bankruptcy estate's plan of
reorganization, the perimeter of "related to" jurisdiction may shrink because, logically,
"it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation
dispute because the debtor's estate ceases to exist once confirmation has occurred."
In re Resorts Int'l, 372 F.3d at 165; see also In re Boston Regional Med. Ctr., 410 F.3d
at 107 ("[T]here will be situations in which the fact that particular litigation arises after
confirmation of a reorganization plan will defeat an attempted exercise of bankruptcy
jurisdiction.").

    A retention-of-jurisdiction provision in a plan confirmation order does not expand
the bankruptcy court's subject matter jurisdiction beyond that allowed by § 1334.  See,
e.g., In re Resorts Int'l, 372 F.3d at 161 ("[I]f a court lacks jurisdiction over a dispute, it
cannot create that jurisdiction by simply stating it has jurisdiction in a confirmation or

other order.").  Even if the parties appearing before the bankruptcy court wish to grant it jurisdiction over disputes arising outside of the scope of the court's jurisdiction statute, they may not do so.  "Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization."  Id.; cf. Horn, 29 F.3d at 768 ("Parties cannot confer subject matter jurisdiction on either a trial or an appellate court by indolence, oversight, acquiescence, or consent.").

Munger and Gupta contend that I need not "wade into the murky waters" of post-confirmation subject matter jurisdiction because the bankruptcy court expressly retained jurisdiction to resolve disputes involving the APA, like Munger's and Gupta's. Appellees' Br. at 10 (quoting In re The Educ. Res. Inst., Inc., 442 B.R. 20, 25 & n.5 (Bankr. D. Mass. 2010)).  Pointing to the retention of jurisdiction provisions in the Sale Order and Plan along with authority approving of such provisions and holding that bankruptcy courts have authority to interpret their own orders, they contend that the bankruptcy court definitively granted itself subject matter jurisdiction over these disputes.[6]  That misses the point.  A court can only retain jurisdiction that it had in the first place.  "If there is no jurisdiction under 28 U.S.C. § 1334 or 28 U.S.C. § 157, retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant."  In re Resorts Int'l, Inc., 372 F.3d 154, 161 (3d Cir. 2004).  To

---

[6] Munger and Gupta also contend that the bankruptcy court had jurisdiction under 28 U.S.C. § 1651, the All Writs Act, because "[t]he Orders at issue in this appeal were clearly necessary and appropriate in aid of the post-confirmation jurisdiction which the Bankruptcy Court appropriately retained and extended in order to protect the integrity of the bankruptcy process."  Appellees' Br. at 11.  Munger's and Gupta's argument begs the question though, because the All Writs Act only authorizes "all writs necessary or appropriate in aid of their respective jurisdictions."  28 U.S.C. § 1651.  It does not determine the reach of the court's subject matter jurisdiction.

find jurisdiction here, I must look beyond the retention of jurisdiction provision and decide whether this dispute falls with the scope of 28 U.S.C. § 1334—i.e., whether this dispute "potentially could have some effect on the bankruptcy estate."[7]  In re Boston Regional Med. Ctr., Inc., 410 F.3d at 105.

All parties admit that this is fundamentally a breach of contract dispute involving the APA.  Munger and Gupta make no arguments under other contracts.  In fact, at least Gupta expressly contends that "the status of Gupta's former contract with the Debtors is irrelevant."  Appellees' Br. at 24; see also QMC II at 5 n.3 (noting that Gupta's "amended claim is brought under the APA, not under his employment contract").  The jurisdictional question therefore turns on whether these disputes among three non-debtors about breach of the APA could affect the Debtors' bankruptcy estate.

The Debtors themselves do not think so.  Debtor Quincy Medical Center, Inc., tells the court that it "has no direct financial interest in the outcome of this appeal."  See Debtor's Statement Regarding Appellate Standing (Docket # 18).  This is a reasonable conclusion, given that no Debtors are parties in this appeal[8]; no party has alleged that the Debtors may be required to indemnify a party in this appeal[9]; no recovery in these

---

[7] I will assume without deciding that these disputes are within the scope of the retention-of-jurisdiction provisions in the bankruptcy court's Sale and Confirmation Orders.

[8] Munger and Gupta did not appeal the bankruptcy court's denial of their administrative claims against the Debtors, where the bankruptcy court concluded that Munger and Gupta "failed to articulate any basis . . . by which QMC should be held liable for Steward's failure to employ [them.]"  Docket # 5-10 at 3 (discussing Munger's claims); see also id. at 4 (reaching similar conclusion on Gupta's claims).

[9] Although both parties discuss an indemnification procedure and escrow set up in the APA in support of their arguments about whether Munger and Gupta are proper third-party beneficiaries (Appellant's Br. at 34; Appellees' Br. at 25-26), neither party suggests that Steward may seek indemnification from the Debtors if Munger's and Gupta's claims against it are successful.  In fact, Steward's briefing in both this court and the bankruptcy court suggests that such a claim would be time-barred.  Appellant's Br. at 6; Docket # 5-23 at 8.

disputes would go to the Debtors or the Debtors' estate; no recovery in these disputes would come from the Debtors; and no aspects of the handling or administration of the estate will be affected by the outcomes of these disputes. Munger and Gupta offer only non-specific and unsupported contentions that "Steward's decision to not offer the Employees employment post-closing . . . is clearly a matter which affected the 'interpretation, implementation, consummation, execution or administration' of the confirmed bankruptcy plan." Appellees' Br. at 9. Munger and Gupta do not suggest that the resolution of these disputes have delayed or could delay the bankruptcy proceedings, nor do they offer any examples of how the Plan is implicated or how these third-party disputes will affect the estate.

These disputes look like ones that could have arisen entirely outside of the bankruptcy context. They are essentially employment disputes that could arise in any asset sale, regardless of whether the sale involved a bankruptcy proceeding. Upon the closing of Debtor's sale of its assets to Steward, Steward either had an obligation to hire Munger and Gupta or it did not. That a court may need to look at terms of the APA establishing the rights among Munger and Gupta, on the one hand, and Steward, on the other, does not mean that it will have to interpret or implement any documents that affect that bankruptcy estate. These issues can be resolved entirely on the APA's terms and without reference to bankruptcy court documents. Munger and Gupta have pointed to no bankruptcy-related issues or to any provisions of the Sale Order, the Plan, the Confirmation Order, or any other order or filing in the bankruptcy court that will require construction to resolve any of appellees' claims. Munger and Gupta

therefore have failed to demonstrate the "close nexus" between their claims against Steward and the bankruptcy proceeding, which is required to establish the bankruptcy court's subject matter jurisdiction.

That this dispute has arisen after the Plan's confirmation only bolsters this conclusion.  This case is not an exceptional case, like In re Boston Regional Medical Center, Inc., where one of the parties is a liquidating entity.  See 410 F.3d at 105.  It is one where the claims are against an ongoing entity that was never a debtor and is no longer involved in the bankruptcy proceeding.  Although the First Circuit did not address this situation in Boston Regional Medical Center, it recognized that a reorganized debtor that has reentered the marketplace presents a strong case for narrowing the bankruptcy court's post-confirmation "related to" jurisdiction because the reorganized debtor must be "emancipated" from the bankruptcy to avoid "the specter of endless bankruptcy jurisdiction and a kindred concern about unfairly advantaging reorganized debtors."  See id. at 106.  Those concerns are even stronger here, where Steward was merely a third-party purchaser of the Debtors' assets and not itself a debtor.  Allowing bankruptcy jurisdiction over any matter involving the purchase agreement would create a specter of litigation in the bankruptcy court for years to come, with Steward—which has always been an ongoing, non-bankrupt entity—being able to insulate itself from litigation about the acquired assets by (perhaps selectively) forcing parties to bring claims against it in the bankruptcy court.

Munger's and Gupta's cited authority is not to the contrary.  Much of what they cite involves claims in which the debtor or its liquidating trust are a party.  For example,

In re Enivid, Inc., 364 B.R. 139, 147 (Bankr. D. Mass. 2007), involved a motion for preliminary injunctions by the trustees of a liquidating trust established under a debtor's confirmed Chapter 11 plan to prevent shareholders from entering into a settlement of their own fraud claims against debtor's officers and directors. The bankruptcy court concluded that it had subject matter jurisdiction to resolve the dispute because it was "conceivable that the allowance or disallowance of the [injunctions] will have an effect on the Plan Trustees' potential recoveries from the D & O Policies' proceeds." Similarly, In re The Educ. Res. Inst., Inc., 442 B.R. 20, 24 (Bankr. D. Mass. 2010), involved a dispute between a creditor and a reorganized debtor. The court exercised subject matter jurisdiction because resolution of the dispute "directly effects the prospects for the newly reorganized [debtor]." Id.; see also First Marblehead Corp. v. The Educ. Res. Inst., Inc., 463 B.R. 151, 154 (D. Mass. 2011); cf. In re G.S.F. Corp., 938 F.2d 1467, 1476 (1st Cir. 1991) (concluding the bankruptcy court had subject matter jurisdiction to enjoin debtor's landlord from proceeding against debtor's secured creditor in state court where the disputes would "put[] the [debtor's] estate at risk of liability for what could be a substantial damage award"). Donaldson v. Bernstein, 104 F.3d 547, 553 (3d Cir. 1997), also involved a dispute that directly impacted the bankruptcy proceeding because the trustee, through the lawsuit, was "basically . . . seeking to carry out the intent of the reorganization plan." Id.; see also id. ("[T]his action implicates the integrity of the bankruptcy process, as the [defendants'] actions impaired [the debtor's] ability to make the payments required under the plan."). In each of these cases, resolution of the underlying dispute would affect the funds available to

12

**Page 61**

the debtor or the execution of the Chapter 11 plan.  That is not the case here.

Accordingly, I find that the bankruptcy court does not have "related to" subject matter

jurisdiction over these actions.[10]

## IV.  Conclusion

The judgment of the bankruptcy court is VACATED and the case is REMANDED

with instructions to dismiss Munger's and Gupta's claims against Steward for lack of

subject matter jurisdiction.

_____January 5, 2015_____                    _____/s/Rya W. Zobel_____

DATE                                                     RYA W. ZOBEL
                                                  UNITED STATES DISTRICT JUDGE

---

[10] As an alternative to arguing that the bankruptcy court had subject matter jurisdiction over this dispute, Munger and Gupta ask me to exercise my purported discretion under Local Rule 206 to treat the bankruptcy court's order as proposed findings of fact and conclusions of law.  I may not do so.  First, Local Rule 206, by its title, applies to "core proceedings."  This is indisputably not a core proceeding. See supra note 5.  Second, Local Rule 206 applies only to cases "referred [to the bankruptcy court] under L.R. 201."  Local Rule 201, however, only refers proceedings that may be referred under 28 U.S.C. § 157—i.e., cases "related to" a case under Title 11.  As explained above, this is not such a proceeding.  Third, even if Local Rule 206 could be construed to allow me to adopt the bankruptcy court's order, it is discretionary and permits me to do decline to do so.  Because Steward contests the adequacy of the proceedings that led to the bankruptcy court's orders, to the extent I am allowed to consider them at all, I decline to adopt them.

**Page 62**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

In re

| | |
|---|---|
| Quincy Medical Center, Inc., | ) |
| QMC ED Physicians, Inc., | ) |
| Quincy Physicians Corporation, | ) |
| *Debtor* | ) |
| | ) File Nos.: 12-40128-RWZ and |
| | ) 12-40131-RWZ |
| | ) (consolidated) |

### Joint Notice of Appeal to the United States Court of Appeals for the First Circuit

Apurv Gupta, M.D. ("Dr. Gupta") and Victor Munger ("Mr. Munger") jointly appeal to the United States Court of Appeals for the First Circuit from the Order and accompanying Memorandum of Decision of the District Court for the District of Massachusetts entered in this case on January 5, 2015, which vacated the judgments of the United States Bankruptcy Court for the District of Massachusetts and remanded the case with instructions to dismiss Dr. Gupta's and Mr. Munger's claims against Quincy Medical Center, a Steward Family Hospital, Inc. ("Steward") for lack of subject matter jurisdiction.

The parties to the Order and accompanying Memorandum of Decision jointly appealed from and the names and addresses of their respective attorneys are as follows:

Apurv Gupta, M.D., represented by:

Bruce W. Gladstone, Esq.
Cameron & Mittleman LLP
301 Promenade Street
Providence, RI 02908
Tel.: 401-331-5700
Fax: 401-331-5787
Email: bgladstone@cm-law.com

Victor Munger, represented by:

Charles R. Bennett, Jr., Esq.
Murphy & King, PC
One Beacon Street, 21st Floor
Boston, MA 02108
Tel.: 617-423-0400
Fax: 617-423-0498
Email: cbennett@murphyking.com

1

Quincy Medical Center, a Steward Family Hospital, Inc., represented by:

Scott R. Magee, Esq.
Edwards Wildman Palmer LLP
111 Huntington Avenue
Boston, MA 02199
Tel. 617-239-0304
Fax: 617-316-8398
Email: smagee@edwardswildman.com

Jonathan W. Young, Esq. (*pro hac vice*)
Edwards Wildman Palmer LLP
250 Salt Island Road
Westbrook, CT 06498
Tel. 312-201-2000
Email: jyoung@edwardswildman.com

David J. Fischer, Esq. (*pro hac vice*)
Edwards Wildman Palmer LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
Tel. 312-201-2000
Email: dfischer@edwardswildman.com

Respectfully Submitted,

Dated:   February 3, 2015

/s/ Bruce W. Gladstone, Esq.
*Attorney for Apurv Gupta, M.D.*
Cameron & Mittleman LLP
301 Promenade Street
Providence, RI 02908
bgladstone@cm-law.com

/s/ Charles R. Bennett, Jr., Esq.
*Attorney for Victor Munger*
Murphy & King, PC
One Beacon Street, 21st Floor
Boston, MA 02108
cbennett@murphyking.com

2

**Page 64**